## In re SKELTON LEAD & ZINC CO.'S GROSS PRODUCTION TAX FOR 1919.

No. 11194—Opinion Filed April 5, 1921.

(Syllabus.)

**1. Taxation—Gross Production Tax on Minerals—Validity—Nature of Tax.**

Under chapter 39, Sess. Laws 1916: "The Oklahoma 'Gross Production Tax' imposed on oil and gas (lead and zinc) producing companies was intended as a substitute for the ad valorem 'property tax.'" Shaffer v. Carter, 252 U. S. 37.

**2. Same.**

The "gross production tax" levied under chapter 39, Sess. Laws 1916, is a "property tax" purely, and is levied in full and in lieu

of all other taxes, state, county, township, district, and municipal.

### 3. Same.

Under chapter 39, Sess. Laws 1916, plain and adequate provision is made for lowering the rate of "gross production tax" so that it will exactly conform to the general ad valorem rate of "property tax" upon other property in the state.

### 4. Taxation—Exemptions—Indian Property.

Under article 10, sec. 6, of the Constitution of this state and under section 7303, Rev. Laws 1910, all such property as may be exempt by reason of treaty stipulations between the Indians and the United States or by federal laws, is expressly exempt from taxation by the state.

### 5. Same — Gross Production Tax — Exemptions—Royalties from Mineral Leases on Restricted Land.

Under chapter 39, Sess. Laws 1916, the royalties due the Indians from oil, gas, and mineral leases under federal supervision and upon restricted lands, are not made taxable and are not taxed by the state.

### 6. Same—Value of Lease on Restricted Land—Construction of Statute.

Under said chapter 39, the value of an oil, gas, or mineral lease, as such, upon restricted lands and under federal supervision, is not to be considered, and is not considered, as an element of value in making up the assessment rolls.

### 7. Same—Report of Lessee to State Auditor.

The provisions in section 1, chap. 39, Sess. Laws 1916, requiring oil, gas, and mineral lessees to report the value of leases to the State Auditor, apply to such leases only as are not on restricted lands nor under federal supervision, and are not intended to apply and do not apply to leases on restricted Indian lands under federal supervision.

### 8. Same—Gross Production Tax Not Occupation Tax.

The "gross production tax" provided for in chapter 39, Sess. Laws 1916, is not an "occupation tax."

### 9. Same—Not Upon Federal Agencies.

The tax imposed by chapter 39, Sess. Laws 1916, is not upon a federal agency, nor upon the right to exercise or operate a federal agency, but is upon the lessees' individual private property.

### 10. Taxation—"Occupation Tax" and "Property Tax" Distinguished.

"Occupation taxes" and "property taxes" are clearly distinct from each other in both species and function, distinctly different in object, purpose, and mission.

The primary purpose, mission, or function of an "occupation tax" is to regulate and control a given occupation or class of business.

The only mission or function of a "property tax" is to raise revenue; when the revenue is collected its mission is fulfilled.

The basis of authority for an "occupation tax" lies in the police power, and its validity depends upon the extent of police power to regulate and control a given subject.

The basis of authority for the "property tax," for necessary revenue, lies in the inherent power of government itself, and its validity is determined, not by the question of power to levy, but by statute and constitutional provisions, which limit and equalize the rate, and govern the manner of valuation and assessment.

### 11. Same — Occupation Tax on Federal Agency—Power of State.

A state has no power to regulate or control the exercise of a federal agency, hence it has no power to impose an "occupation tax" upon the right of exercising a federal agency.

### 12. Taxation — Power of State—Property Subject to Ad Valorem Tax.

A state has inherent power to raise the necessary revenue for state government, hence it has power to impose an "ad valorem tax" upon all property which must look to the state for protection and which the state is obligated to protect.

### 13. United States—Relation of State and Federal Governments.

Under our dual system, the state and federal governments are mutually dependent upon each other, and equally so; the exercise of the proper functions of each being essential to that of the other, and the proper operation of both being essential to the existence of our dual scheme of government.

### 14. Taxation — Gross Production Tax on Lead and Zinc—Construction of Statute.

The provision in chapter 39, Sess. Laws 1916, for the payment of a sum equal to 1½ per cent. of the gross value of lead and zinc products is merely a means or measure adopted by the Legislature for ascertaining the fair cash value of the mills, plants, machinery, equipments, and other property used in the operation thereof, as a going concern.

### 15. Same—Validity of Tax.

The mills, plants, machinery, equipments, and all other property, being exclusively the private property of the lessee, and having a situs within this state, and not being exempt by law, are subject to state taxation, and the "gross production tax," being merely a measure for ascertaining the fair cash value of such property, is a valid tax.

Kane and Miller, JJ., dissenting.

Appeal from State Board of Equalization.

From action of State Board of Equalization denying the protest of the Skelton Lead & Zinc Company in the matter of its gross production tax for the year 1919, the company appeals. Affirmed.

Vern E. Thompson, for plaintiff in error.

S. P. Freeling, Atty. Gen., and C. W. King, Asst. Atty. Gen., for defendant in error.

HARRISON, C. J. This case is here upon appeal from an order of the State Board of Equalization overruling protest of the Skelton Lead & Zinc Company against payment of its "gross production tax."

The order appealed from was made upon an agreed statement of facts, in substance as follows: That the taxes for 1919 amounted to $2,033.56; that they were estimated upon the value of gross production of lead and zinc from protestant's mines; that the mines were operated under leases upon restricted lands of the Quapaw Indians, said leases having been made under authority of the act of Congress approved June 7, 1897; that most of said leases were upon lands belonging to allottees that had been adjudged incompetent, but some were upon lands whose owners had not been so adjudged; and that should a distinction be made between the lands of competents and those of incompetents, as to their liability for taxation, the taxes, then, should be calculated accordingly.

It was also agreed that the Lead and Zinc Company had erected on said lands a number of concentrating plants (five, it appears from the protest filed), in each of which plants there had been installed machinery and devices for the purpose of hoisting, smelting, and cleaning the ores produced from the mines; that said plants, machinery, and equipments were necessary in order to produce said ore and prepare same for market, and were used exclusively for such purpose; and that no "ad valorem tax" had been paid on said plants, equipment, etc., for said year.

It was further agreed that said statement of facts be submitted to the board of equalization for a final decision, first, as to whether or not the ore from said leases or any of same is subject to the "gross production tax"; second, whether or not the concentrating plants and machinery and equipment are subject to an "ad valorem tax."

It appears that no "ad valorem tax" had been levied on any of said property. Protestant claims that the plants, machinery, and devices are not subject even to an "ad valorem tax," and that the ores produced are not subject to a "gross production tax"; that the plants, machinery, and other tangible effects, being necessarily used in the operation of leases under federal supervision, are federal instrumentalities, and therefore not subject even to an "ad valorem tax." And that the "gross production tax" is an "occupation tax," and that the ores obtained, being the products of a federal agency, are not subject to an "occupation tax."

These two propositions, however, are assigned as follows: (1) Are the improvements, the plants and machinery upon, and the ore obtained from, leases belonging to allottees who have been adjudged incompetent subject to either an "ad valorem" or a "gross production" tax? (2) Are the improvements, the plants and machinery upon, and the ore obtained from, leases belonging to allottees who have not been adjudged incompetent subject to either an "ad valorem" or a "gross production" tax?

In this connection, we take occasion to say, in justice to protestant and to the counsel who briefed the case, that these questions are submitted with utmost fairness and frankness, without attempt to distort or evade the real provisions of statutes, and without resort to subterfuge in their argument.

As to whether there may be or should be a distinction made between the two classes of allottees as to liability for taxes, it is not necessary to determine. The tax is not levied upon anything belonging to either class of Indians, nor anything in which either class of Indians or the government has any ownership, or over which either exercises any control.

Article 10, sec. 6, of the state Constitution expressly exempts all "such property as may be exempt by reason of treaty stipulations existing between the Indians and the United States government or by federal laws." Section 7303, Rev. Laws 1910, subdivision 8th, expressly exempts all "such property as may be exempt by reason of treaty stipulations existing between the Indians and the United States government or by federal laws." Section 1, ch. 39, Sess. Laws 1916, the statute under which the tax in question was levied, expressly exempts all "such royalty interests as are exempt from taxation under the laws of the United States."

Hence the statute does not impose either an "ad valorem" or a "gross production" tax upon any of the property of the Indians, nor upon the royalties due them from the lessees.

As we interpret the statute, it seeks merely to levy a "property tax" upon the lessees' individual personal property, such tax to be estimated upon the **gross value** of the lessees' private personal share of mine products after such share has been separated from the royalties due the Indians and taken into the lessees own exclusive possession and private control, such rate of tax to be no greater nor less than the general "ad valorem" rate upon other taxable property within the state, and to be **in full and in lieu of all other taxes upon the entire property.** Hence the question of the taxability of the Indian's property or his share of the mine products is not in the case. His property is expressly left out of the levy, and is not involved.

The direct question involved here is whether the lessee's **individual personal property** is subject to a "property tax," the same rate of "property tax," to which other property within the state is subject, or whether, being fortunate enough to have obtained a lease upon Indian lands, his personal property, by reason of such fact, shall be immune from taxation.

In deciding this question we bear in mind that the tax in question is not levied upon the mine products themselves, but, as we interpret the statute, is levied upon the entire property, mills, plants, machinery, equipment, etc., "as a going concern," the value of which "as a going concern" and the reasonableness of the rate upon which are to be ascertained by the **gross value** of the products.

Chapter 39, sec. 1, Sess. Laws 1916, provides that the mine operator shall make reports showing "the kind of such mineral, oil or gas produced, the gross amount thereof, and the actual cash value thereof at the place of production; the amount of royalty payable thereon, if any, to whom payable, and whether it is claimed that such royalty is exempt from taxation by law, * * * and shall at the same time pay to the State Auditor a tax (not upon the products themselves, but a tax) **equal** to ½ of 1 per centum of the **gross value**" of the **mined products.**

The same section provides also that "the payment of the taxes herein imposed shall be **in full and in lieu of all taxes** by the state, county, cities, towns, townships, and school districts and other municipalities * * * upon the machinery, appliances, and equipments used in and around any well * * * and also upon the oil, gas, asphalt, or ores * * * during the year in which same is produced."

Thus it appears that the sole object of the Legislature was to adopt a practicable means for ascertaining the fair cash value of these smelting plants and equipment "as going concerns," and to levy a "property tax" thereon according to such value, and, deeming the **gross value** of the products therefrom a fair and practicable measure for ascertaining such value, it adopted such measure and levied a tax which it specifically provided should be **in full and in lieu of all other taxes,** and which should be no greater nor less than the general **ad valorem** rate of "property tax," upon other property within the state, assessed at its fair cash value. And in order to attain this object and to provide adequate means for its attainment, the same act, chapter 39, Sess. Laws 1916, page 105, provides that:

"The State Board of Equalization, upon its own initiative, may, and upon complaint of any person who claims that he is taxed too great a rate hereunder, shall, take testimony to determine whether the taxes herein imposed are greater, or less than the general **ad valorem** tax for all purposes would be on the property of such producer subject to taxation in the district or districts where the same is situated, including the value of oil, gas, or mineral leases, or of the mining or mineral rights, the machinery, equipment or appliances used in the actual operation of in and around any such well or mine, the value of the oil, gas, asphalt or any of the said mineral ores produced and any other element of taxable value in lieu of which the tax herein is levied. The said board shall have power and it shall be its duty to raise or lower the rates herein imposed to conform thereto. An appeal may be had from the decision of the State Board of Equalization thereon, by any person aggrieved, to the Supreme Court, in like manner and with like effect as provided by law in other appeals from said board to said court."

From this it is clear that the Legislature had no other object than to levy a "property tax" upon mining property according to its fair cash value, using the measure therein adopted for ascertaining such value, and providing the means therein provided for correcting any mistakes which might result from overvaluation or excessive rate. See In re Gross Production Tax of Exchange Oil Co., 80 Okla. 52, 193 Pac. 999.

While the board of equalization has no power to lower the valuation, it does have the power and it is expressly made its duty to lower the rate, which has the same effect. The valuation, it will be observed, is largely, and in most cases wholly, made upon the sworn reports of the mine operator. It was therefore unnecessary to give the board authority to lower the valuation, but was necessary to give it power to lower the rate so as to make it exactly conform to the

general "property tax" levied upon other property upon the basis of its fair cash value. No complaint is made as to the rate being excessive or higher than the ad valorem rate upon other property.

The statute provides, further, that if any of such products remain unsold and in the state for the succeeding tax year, they shall then be assessed as other property upon the general ad valorem basis.

Therefore we cannot sustain the contention that this is any other than a "property tax."

The case of In re Gross Production Tax of Wolverine Oil Company, 53 Okla. 24, 25, 154 Pac. 363, in so far as it held the gross production tax, chapter 107, Sess. Laws 1915. which was similar in purpose to the tax under consideration here, to be not a property tax and not a substitute for the general ad valorem tax. is hereby overruled.

There is nothing in the act that sustains such contention. The only plausible reason we see for contending that it is an "occupation tax" is that if it is such a tax, the leasing of restricted lands being a federal instrumentality, then the state has no power to levy such a tax upon the privilege of exercising a federal instrumentality. That the operation of this character of lease is a federal instrumentality we readily concede. That question was decided in Choctaw, O. & G. R. Co. v. Harrison, 235 U. S. 292, and Indian Ter. Oil Co. v. Oklahoma, 240 U. S. 522. Likewise the proposition that the state has no power to levy a tax upon the privilege of operating a federal instrumentality is conceded. That question also was settled more than 50 years ago in Thomson v. Union Pac. R. Co., 76 U. S. (9 Wall.) 592, wherein Mr. Chief Justice Chase, who delivered the opinion, said:

"But we think there is a clear distinction between the means employed by the government and the property of agents employed by the government. Taxation of the agency is taxation of the means; taxation of the property of the agent is not always, or generally, taxation of the means."

We fully realize that the state has no power to levy an "occupation tax" upon an agency of the government, and, as a matter of fact, it has never sought to exercise such power, but we hold that it does have authority to levy a "property tax" upon the private property of the agent—when such property has a situs within the state.

There is no excuse for a confusion of the two kinds of taxes, "occupation taxes" and "property taxes." They are separate and distinct species of taxes, as distinct from each other in their kind and in their mission

as tort and assault. A tax is an "occupation tax" or a "property tax" according to what it actually is, the same as a lens is concave or convex, or a coin is silver or gold. They are essentially different, in both their character and their mission. The sole mission or function of a "property tax" being to raise revenue, and when the revenue is collected its mission is fulfilled. It never imposes any conditions nor places any restrictions upon the use of property or the exercise of a privilege. The mission of a "license tax," "occupation tax," or "privilege tax," or by whatever name this species of tax may be called, is always to regulate a given business, or control the right to engage in a given occupation. It is imposed as a condition or as an element of the conditions upon the right to exercise a given privilege, its primary mission being to regulate and control; and, while the tax itself may not always be the sole condition, yet its payment is invariably made a part or a factor in the conditions upon which a business may be conducted by the statute under which such tax is levied. In other words, the primary object and purpose of every statute which levies an "occupation tax" is to regulate the conduct of the business affected,

The kind of a tax or the species to which it belongs is not made by giving it a name, nor its species changed by changing its name, either by legislative enactment or by judicial decree. It is a "property tax" or an "occupation tax" according to the mission given it by the law under which it is levied.

The power to levy the two taxes is derived from different sources of government—the "occupation tax" from the police power to regulate, while the "property tax" is from the power to raise revenue. The validity of the two taxes is tested and determined under different principles of law. The validity of an "occupation tax" is determined by the question whether a state has the power at all to levy such a tax—whether it is at all within the police power of a state to impose such a tax, with its attendant regulatory conditions. The validity of a "property tax" is not determined by whether a state has power to levy such a tax, because such power is inherent, the power to raise the necessary revenue for government being inherent in the very fact of government itself, and the validity of such a tax is determined by the law governing its rate, its uniformity, its reasonableness or excessiveness, or whether it is discriminatory or confiscatory, or whether the manner of its assessment and collection is regular or irregular or constitutes "taking without due process of law," or amounts to "denial of equal protection under

the law. The basis of an "occupation tax" lies in the police power to regulate, but the basis of a "property tax" is **inherent** in the very fact of governmental protection of property. The fact that the proceeds of an "occupation tax" may constitute a portion or the sole source of revenue does not change its mission, nor make it any the less an "occupation tax." Nor does the fact that an "occupation tax" is levied upon an **ad valorem** basis render it any the less an "occupation tax." This method is quite frequently adopted, and in some cases might be the most just and reasonable measure for such a tax. Both kinds of taxes may be levied upon the same property, and both be levied upon an ad valorem basis, and both be valid. Or both may be invalid, the "property tax" because it is excessive or discriminatory, and the "occupation tax" because the state has no power to levy it. Neither does the fact alone that a given tax may be a burden upon a given business constitute a test as to what kind of a tax it is, nor does the amount or weight of such burden alone constitute a test as to its validity. A tax may be a very onerous burden, and still be perfectly valid, or it may be so very slight as to constitute no perceptible burden, and yet be wholly invalid; nor does the fact alone that the weight of such burden be indirectly upon a federal agency either change the character of the tax or constitute an exclusive test as to its validity. See Wiggins Ferry Co. v. East St. Louis, 107 U. S 374; Western Union Tel. Co. v. Atty. Gen. of Mass., 125 U. S. 550-51. For further illustration: In Thomas v. Gay, 169 U. S. 264, a tax of 24 mills on the dollar levied by Oklahoma Territory upon cattle grazed upon an Indian reservation under a federal lease was held to be a valid tax because it was a "property tax" within the proper scope of the power to raise revenue; and yet, if the territory had sought to impose a tax of one-tenth of one mill upon the mere right to graze cattle upon such reservation, the payment of such tax being made a condition upon the mere right to exercise such federal agency, such tax would at once have been declared invalid, yet the burden of such tax upon such federal instrumentality would have been only 1/240 part as heavy as the tax which the court held to be valid, the reason being that the lighter tax was one which in the very nature of our dual form of government a state has no power to levy, it being an "occupation tax," while the other tax, the "property tax," though 240 times as great, was held to be valid, being upon the lessees' private property having a taxable situs within the territory. The same questions were involved and same decision

rendered in Wagoner v. Evans, 170 U. S. 588.

Upon the same principle the "net proceeds tax" of Nevada was held to be valid in Forbes v. Gracey, 94 U. S. 762.

And the Colorado "gross products tax" upon mining claims from the government was upheld in Elder v. Wood, 208 U. S. 226-7.

Upon the same principle the "gross receipts tax" of Minnesota was upheld in U. S. Express Co. v. Minnesota, 223 U. S. 335.

And in Gromer v. Standard Dredging Co., 224 U. S. 362, the Porto Rican tax was held to be valid.

Therefore the weight of a tax, or its effect in dollars and cents, is not of itself a test of its validity, nor of its kind.

A "property tax" constitutes a burden upon a given business only to the extent of the amount of the tax, but an "occupation tax" with its ancillary conditions, if not paid, may stop the business altogether. We must conclude, therefore, that the present tax is a "property tax."

But it is contended that the state is foreclosed from levying a tax upon this class of property by decisions of the Supreme Court of the United States, and that this court is bound by such decisions. Let us see. The decisions relied upon as foreclosing the state and as being binding upon this court are: Choctaw, O. & G. R. Co v. Harrison, 235 U. S. 292; Indian Ter. Ill. Oil Co. v. Oklahoma, 240 U. S. 522; Large Oil Co. v. Howard, 248 U. S. 549; Howard, Auditor, v. Gypsy Oil Co., 247 U. S. 504.

Upon examination of these decisions, however, we find that only one of them (Choctaw, etc., R. Co. v. Harrison) even mentions the question whether the state has power to levy a "property tax" upon the lessee's personal share of mine products, and in that decision it is said:

"But it is insisted that the statute, rightly understood, prescribed only an ad valorem imposition on the personal property owned by appellant—the coal at the pit's mouth,—which is permissible, according to many opinions of this court. Thomson v. Union P. R. Co., 9 Wall. 579, 19 L. Ed. 792; Union P. R. Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787; Central P. R. Co. v. California, 162 U. S. 91, 40 L. Ed. 903, 16 Sup. Ct. Rep. 766; Thomas v. Gay, 169 U. S. 264, 42 L. Ed. 740, 18 Sup. Ct. Rep. 340."

Neither of the other decisions even mentions the question, and none of them, not even Choctaw, etc., R. Co. v. Harrison, makes

the slightest reference to the statute under consideration here. In Choctaw, etc., R. Co. v. Harrison, a different statute (the statute of 1907-8) was under consideration, a statute which in its purpose and in its provisions was altogether different from the statute now involved. In neither of the other decisions does it appear what statute was involved, nor what question was decided. They merely follow Choctaw, etc., R. Co. v. Harrison and Indian Ter. Ill. Oil Co. v. Oklahoma in very brief memoranda opinions, without disclosing what statute was involved or what question was decided. The reasonable presumption upon their face would be that the same statute and the same questions were involved in each case that were decided in Choctaw, etc., R. Co. v. Harrison and Indian Ter. Ill. Oil Co. v. Oklahoma. They are as follows:

Large Oil Co. v. Howard, Auditor, 248 U. S. 549, memorandum opinion in full as follows:

"Per Curiam: Judgment reversed with costs, and cause remanded for further proceedings upon the authority of Choctaw, O. & G. R. Co. v. Harrison, 235 U. S. 292, 59 L. Ed. 234, 35 Sup. Ct. Rep. 27; Indian Territory Illuminating Oil Co. v. Oklahoma, 240 U. S. 522, 60 L. Ed. 779, 36 Sup. Ct. Rep. 453. And see Howard v. Gypsy Oil Co., 247 U. S. 503, 62 L. Ed. 1239, 38 Sup. Ct. Rep. 426."

And Howard, Auditor, v. Gypsy Oil Co., 247 U. S. 503, and companion cases, memorandum opinion in full as follows:

"Per Curiam: Judgments affirmed with costs upon the authority of Choctaw & Gulf R. R. Co. v. Harrison, 235 U. S. 292; Indian Territory Illuminating Oil Co. v. Oklahoma, 240 U. S. 522."

Upon the face of those opinions this court cannot say what was decided. It can say that the statute of 1916 is not referred to, and that the question of a state's power to tax a lessee's private, personal share of mine products is not mentioned. Those decisions, whatever may have been the questions involved, are, as a matter of course, final as to those particular cases, but we do not feel that they constitute precedents which bind this court in its decision of questions not mentioned in those opinions nor decided adversely in the cases which they follow. The statute under consideration here was not involved in Choctaw, etc., R. Co. v. Harrison, nor in Indian Ter. Ill. Oil Co. v. Oklahoma. The question involved here was not involved nor mentioned in Indian Ter. Ill. Oil Co. v. Oklahoma, and the only reference made to it in Choctaw, etc., R. Co. v. Harrison was: "That an ad valorem tax imposed on the personal property owned by appellant—the

coal at the pit's mouth—was permissible according to many opinions of this court." Hence, the above statement being the only reference made in any of the above cases to the precise question involved in the case at bar, we feel that we are supported by them rather than that we are precluded by them. A further review of those cases may serve to enlighten.

Choctaw, etc., R. Co. v. Harrison was the first of the cases from this state involving the power to tax minerals obtained under leases upon restricted lands. The statute under consideration in that case was section 6, art. 2, ch. 71, Session Laws 1907-8, which provided for a tax upon the gross revenue of oil and mineral produced, but provided in express terms that such tax should be in addition to the general ad valorem taxes levied and collected upon the same property. Such a tax was obviously illegal and the statute void on its face, for the reason that it was a double tax and discriminatory, and amounted to a plain denial of equal protection under the law. It was contended by the Choctaw Railway Company that the tax was an "occupation tax", and that the state had no power to levy such a tax. The court in passing upon the question did not say positively that it was an "occupation tax", but did say that "it was a method commonly pursued in respect to license and occupation taxes", citing Pullman Co. v. Knott, 235 U. S. 23, which, however, involved a Florida statute wherein the express purpose and intention was to levy an "occupation tax" intended as a factor in the regulation of the Pullman Company's business. The court said, also, in reference to our statute, "that it had the effect of an occupation tax," citing Ohio Tax Cases, 232 U. S. 576, 579, which involved an Ohio statute wherein the sole object and purpose of the tax was declared to be a "license" for the privilege of doing business in the state. The title of the Florida statute was:

"An Act Imposing Licenses and Other Taxes, Providing for the Payment Thereof, and Prescribing Penalties for Doing Business without a License. * * *"

The Ohio statute contained this provision:

"* * * The auditor of state shall charge for collection, from each railroad company, a sum in the nature of an excise tax, for the privilege of carrying on its intrastate business. * * *"

The Oklahoma statute of 1907-8 contained no such provision nor imposed any such conditions, and hence was not similar to either the Florida or Ohio statute. It levied a "property tax" strictly, which was clearly intended as such, but being a double tax,

being in addition to the general tax, it was discriminatory, and therefore a denial of equal protection under the law and was palpably invalid and the court properly so held it to be.

The next case in the line of cases from this state and relied upon as binding upon this court was Indian Ter. Ill. Oil Co. v. Oklahoma, 240 U. S. 522. In that case the determinative question was whether the value of an oil lease upon restricted Osage Indian lands could be included as an element or item of taxable value and be taxed, as such, in assessing and taxing the property of the Indian Ter. Ill. Oil Company, and the court, following its decision in Choctaw, etc., R. Co. v. Harrison, holding a coal lease to be a federal agency, held an oil lease in the latter case to be a federal agency, and, assuming the same statute to be involved in both cases, and that as the "gross revenue tax" in the first case had been held to be an "occupation tax," held, in the latter case, that an oil lease, as such, could not be made subject to such a tax.

The next case in line was Large Oil Co. v. Howard, 248 U. S. 549. The opinion in that case is quoted in full above.

Thereafter four other cases went up from this state, viz: Howard v. Gypsy Oil Co.; Howard v. Ind. Ter. Ill. Co.; Howard v. Okla. Oil Co., and Howard v. Barnsdale Oil Co., 247 U. S. 504. These four cases were consolidated and decided in one per curiam. The per curiam is quoted in full above.

Now every reasonable presumption would be, and every logical inference be, that the same statute was under consideration and the same questions determined in the foregoing memoranda opinions that were decided in Choctaw, etc., R. Co. v. Harrison and Indian Ter. Ill. Oil Co. v. Oklahoma, and, as the statute under consideration now was not involved in Choctaw, etc., R. Co. v. Harrison nor in Indian Ter. Ill. Oil Co. v. Oklahoma, nor the same questions raised here that were decided in either of said cases, except where it was said in Choctaw, etc., R. Co. v. Harrison that a "property tax" on "coal at the pit's mouth is permissible", we do not feel bound—in fact, we are unable to see just how or in what way we should be bound—in our determination of the questions presented here by such line of decisions, except by what was said in Choctaw, etc., R. Co. v. Harrison.

The statute under consideration here and the statute considered in Choctaw, etc., R. Co. v. Harrison are very materially different. The statute of 1907-8 levied a tax upon mine products and expressly provided that such tax should be in addition to the general ad valorem tax. The statute of 1916 expressly declares that the tax shall be in full and in lieu of all and every other tax, and especially provides that it shall be no greater nor less than the general ad valorem tax, and affords plain, adequate means for correcting all errors so as to make the rate exactly conform to the general ad valorem rate upon other property.

As was said of this same statute in Shaffer v. Carter, 252 U. S. 37, "the Oklahoma 'Gross Production Tax' was intended as a substitute for the ad valorem 'property tax'." The income tax in the Shaffer case was sustained primarily upon the ground that the "gross production tax" was a substitute for the ad valorem "property tax."

The fact that this statute has never been mentioned by the Supreme Court of the United States until it held, as above quoted in Shaffer v. Carter, subsequently decided, the fact that the whole line of said decisions is based upon authority of Choctaw, etc., R. Co. v. Harrison, and the fact that in Choctaw, etc., R. Co. v. Harrison it is plainly said that the very kind of a tax which the statute of 1916 levies is permissible according to many opinions of that court, should be sufficient answer to the claim that this court is forestalled by said decisions from sustaining the validity of such statute and the legality of the tax therein levied.

But, as some doubt seems still to be entertained as to what decisions this court should be bound by, and what ones it may be justified in following, we will review a few of the many decisions of that court wherein the precise question involved in the case at bar has been squarely and emphatically passed upon by that court.

And in ascending a point from which we may view the long line of interwoven decisions upon the question, we bear in mind that if this court is justified in following the trend of that plain, beaten line, the Legislature of this state also had a right to rely upon same and act upon the authority of same in determining its power to enact the statute under consideration.

Beginning with Forbes v. Gracey, 94 U. S. 762—and we deem it unnecessary to go beyond that case for the reason that all the decisions antedating that case have often been cited and quoted from and followed in subsequent decisions—we find, first, that the Nevada statute providing for a "net proceeds tax" on minerals and ores obtained from government land under mining rights obtained from the government, was upheld and the legality of the tax sustained. The Nevada statute was identical in principle

and purpose with ours. In passing upon the right of the state to tax these minerals and the kind of property which such minerals constituted, the court said:

."The moment this ore becomes detached from the soil in which it is imbedded it becomes personal property, the ownership of which is in the man whose labor, capital, and skill has discovered and developed the mine and extracted the ore or other mineral product. It is then free from any lien, claim, or title of the United States, and is rightfully subject to taxation by the state as any other personal property is. The truth of this proposition is too obvious to need or admit of illustration or elaboraton. * * * In regard to the taxing of this personal property and the mode of collecting it by sale as provided in the section last cited, it does not seem to us that there can be any reasonable ground for asserting that the United States has any interest in the tax or in the sale of the property taxed."

In Belk v. Meagher, 104 U. S. 283, Mr. Chief Justice Waite said:

"A mining claim perfected under the law is property in the highest sense of that term, which may be bought, sold and conveyed, and will pass by descent"—citing Forbes v. Gracey, 94 U. S. 767.

In Postal Tel. Cable Co. v. Adams, 155 U. S. 687-8, Mr. Chief Justice Fuller said:

"Doubtless, no state could add to the taxation of property according to the rule of ordinary property taxation, the burden of a license or other tax for the privilege of using * * * an instrumentality of interstate commerce, * * * but the value of property results from the use to which it is put and varies with the profitableness of that use, and by whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property. * * * it is not open to attack as inconsistent with the Constitution."

In Ficklen v. Taxing District, 145 U. S. 22, Mr. Chief Justice Fuller distinguished the case at hand from the case of Philadelphia Co. v. Pennsylvania, 122 U. S. 326, but, referring to a statement made in the latter case by Mr. Justice Bradley, who delivered the opinion, Mr. Chief Justice Fuller said:

"It is well settled that a state has power to tax all property having a situs within its limits, whether employed in interstate commerce or not. It is not taxed because it is so employed, but because it is within the territory and jurisdiction of the state. Pullman Palace Car Co. v. Pennsylvania, 141 U. S. 18 (35; 613) 3 Inters. Com. Rep. 595; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196 (29: 158). And it has been often laid down that the property of corporations holding their franchises from the government of the United States is not exempted from taxation by the state of its situs. Union Pac. R. Co. v. Peniston, 85 U. S. 18 Wall. 5 (21: 787) ; Thompson v. Union Pac. R. Co., 76 U. S. 9 Wall. 579 (19: 792) ; Western U. Teleg. Co. v. Massachusetts, 125 U. S. 530 (31: 790.)"

In Wisconsin & M. R. Co. v. Powers, 191 U. S. 379, Mr. Justice Holmes said:

"We need say but a word in answer to the suggestion that the tax is an unconstitutional interference with interstate commerce. In form the tax is a tax on 'the property and business of such railroad corporation operated within the state,' computed upon certain percentages of gross income. The prima facie measure of the plaintiff's gross income is substantially that which was approved in Maine v. Grand Trunk R. Co., 142 U. S. 217, 228, 35 L. Ed. 994, 995, 3 Inters. Com. Rep. 807, 12 Sup. Ct. Rep. 121, 163. See, also, Western U. Teleg. Co. v. Taggart, 163 U. S. 1, 41 L. Ed. 49, 16 Sup. Ct. Rep. 1054."

In Galveston, H. & S. A. R. Co. v. Texas, 210 U. S. 217, a Texas statute which levied a tax upon gross receipts of interstate commerce was held invalid, but Mr. Justice Holmes, who delivered the opinion, said:

"By whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the Constitution"—citing Postal Teleg. Cable Co. v. Adams, 155 U. S. 687-8.

In McHenry v. Alford, 168 U. S. 651, Mr. Justice Peckham, in discussing the tax under consideration, said:

"* * * When it is said, as it is in this act, that the tax collected by this method shall be in lieu of all other taxes whatever, it would seem that it might be claimed with great plausibility that a tax levied under such circumstances and by such methods was not in reality a tax upon the gross earnings, but was a tax upon the lands and other property of the company, and that the method adopted of arriving at the sum which the company should pay as taxes upon its property was by taking a percentage of its gross earnings."

In United States Express Co. v. Minnesota, 223 U. S. 335, in sustaining a Minnesota statute which is exactly similar to the statute under consideration here, Mr. Justice Day, who delivered the opinion, sustained the Minnesota statute upon the authority of former decisions, among which he cited and quoted from Postal Teleg. Cable Co. v. Adams, 155 U. S. 688; Pullman Palace Car Co. v. Pennsylvania, 141 U. S. 18; Ficklen v. Taxing District, 145 U. S. 1; Wisconsin

& M. R. Co. v. Powers, 191 U. S. 379; Maine v. Grand Trunk R. Co., 142 U. S. 217; Galveston, H. & S. A. R. Co. v. Texas, 210 U. S. 217; McHenry v. Alford, 168 U. S. 651; quoting and relying upon the same language which we have above quoted.

In Brown v. Spillman, 155 U. S. 665, the court expressly held that the lessee's share of oil and gas, after it had been taken from the ground by the lessee, was then his personal property and subject to his control.

In Ohio Oil Co. v. Indiana, 177 U. S. 190, the same thing was held upon the authority of Brown v. Spillman, supra, the court citing, quoting, and relying upon the reasoning in Brown v. Spillman.

In Manuel v. Wulff, 152 U. S. 505-6, Mr. Chief Justice Fuller held that mining claims upon government lands are property which might be sold, transferred, mortgaged, and inherited, without infringing the title of the United States, citing Forbes v. Gracey, 94 U. S. 762, supra; Belk v. Meagher, 104 U. S. 279, supra.

In St. Louis Mining Co. v. Montana Mining Co., 171 U. S. 654, Mr. Chief Justice Fuller again held that a mining claim was the individual property of the owner of the claim, and that he might sell it, mortgage it, or part with it as he saw fit, citing Forbes v. Gracey, 94 U. S., supra; Manuel v. Wulff, 152 U. S. 505, supra.

In Elder v. Wood, 208 U. S. 226, the "gross product tax" law of the state of Colorado was sustained and the tax held to be valid. In this case it was contended that the "gross products tax" upon the mining claims and products from the mines granted by the United States was invalid for the reason that the operation of such mines was a federal agency which the state had no right to tax. The opinion of the court was delivered by Mr. Justice Moody, holding that the property value of the claims and the products obtained from the mines were property belonging to the operator of the mines, the court saying: "Such an interest from early times has been held to be property distinct from the land itself, vendable, inheritable, and taxable"—citing Forbes v. Gracey, 94 U. S. 762; Belk v. Meager, 104 U. S. 279; Manuel v. Wulff, 152 U. S. 505; St. Louis Mining & Milling Co. v. Montana Mine Co., 171 U. S. 650.

In Wiggins Ferry Co. v. East St. Louis, 107 U. S. 365-374, the court said:

"A state cannot regulate foreign commerce, but it may do many things which more or less affect it. It may tax a ship or other vessel used in commerce the same as other property owned by its citizens. A state may tax the stages in which the mail is

transported, but this does not regulate the conveyance of the mail any more than taxing a ship regulates commerce, and yet, in both instances, the tax on the property in some degree affects its use."

Upon the authority of Gibbons v. Ogden, 9 Wheat. 1; Passenger Cases, 7 How. 283; Morgan v. Parham, 16 Wall. 471, the court based the conclusion above quoted.

In Western Union Tel. Co. v. Attorney General of Mass., 125 U. S. 530-555, 31 L. Ed. 794, in an opinion by Mr. Justice Miller, the court said:

"It cannot be that a state tax which remotely affects the efficient exercise of a federal power is for that reason alone inhibited by the Constitution. To hold that would be to deny to the states all power to tax persons or property. Every tax levied by a state withdraws from the reach of federal taxation a portion of the property from which it is taken, and to that extent diminishes the subject upon which federal taxes may be laid. The states are, and they must ever be, coexistent with the national government. Neither may destroy the other. Hence the federal Constitution must receive a practical construction. Its limitations and its implied prohibitions must not be extended so far as to destroy the necessary powers of the states, or prevent their efficient exercise. * * * A very large proportion of the property within the states is employed in execution of the powers of the government. It belongs to governmental agents, and it is not only used but it is necessary for their agencies. United States mails, troops, and munitions of war are carried upon almost every railroad. Telegraph lines are employed in the national service. So are steamboats, horses, stage coaches, foundries, ship yards, and multitudes of manufacturing establishments. They are the property of natural persons or of corporations, who are agents or instruments of the general government, and they are the hands by which the objects of the government are attained. Were they exempt from liability to contribute to the revenue of the states, it is manifest the state governments would be paralyzed. While it is of the utmost importance that all powers vested by the Constitution of the United States in the general government should be preserved in full efficiency, and while recent events have called for the most unembarrassed exercise of many of those powers, it has never been decided that state taxation of such property is impliedly prohibited."

In Central Pac. R. Co. v. California, 162 U. S. 91, Mr. Chief Justice Fuller, quoting from Union Pac. R. Co. v. Peniston, 84 U. S. 5, said:

"It cannot be that a state tax (meaning a 'property tax') which remotely affects the

efficient exercise of a federal power is for that reason alone inhibited by the Constitution. To hold that would be to deny to the states all power to tax persons or property."

In this case the court also cites and quotes with approval from Thomson v. Union Pac. R. Co., 76 U. S. 579.

In Utah & Northern R. Co. v. Fisher, 116 U. S. 28; Maricopa & Phoenix R. Co. v. Ariz. Ter., 156 U. S. 347; Thomas v. Gay, 169 U. S. 264; Wagoner v. Evans, 170 U. S. 588, the court expressly and squarely held that a state or territory had power to levy a "property tax" upon private property used under federal authority upon Indian reservations.

In Thomas v. Gay, 169 U. S. 264, supra, the identical questions were presented and decided that are involved in the case at bar, and every question involved in the case at bar was decided in Thomas v. Gay. In that case the Department of the Interior had leased to cattle men the gr. zing lands of the Osage Indian reservation, and great herds of cattle amounting to tens of thousands were grazed upon the said lands. These reservations being attached to Oklahoma Territory for judicial purposes, the territory sought to tax the cattle.

The cattlemen contended that such a tax was a violation of the rights of the Indians, and an invasion of the jurisdiction and control of the United States over that and other lands. In answer to this the court said:

"As to that portion of the argument * * * that * * * the territorial authorities have no right to tax property of others than Indians located upon these reservations, it is sufficient to cite the cases of Utah & N. R. Co. v. Fisher, 116 U. S. 28, and Maricopa & P. R. Co. v. Arizona, 156 U. S. 347."

It was also contended that to force the cattlemen to pay this tax would affect the price which they could pay for the lease right to graze. In answer to this contention the court said:

"But it is obvious that a tax put upon the cattle of the lessees is too remote and indirect to be deemed a tax upon the lands or privileges of the Indians. A similar contention was urged in the case of N. Y., Lake Erie & W. R. Co. v. Pennsylvania, 158 U. S. 431. There the state of Pennsylvania had imposed a tax upon a railroad, * * * engaged in carrying on interstate commerce, and this tax was measured by reference to the amount of tolls received. * * * It was claimed that the imposition of a tax on tolls might lead to increasing them, * * * and * * * become a tax charge upon interstate commerce, but this court held that such a tax upon tolls was too indirect and remote to be regarded as a tax or burden upon interstate commerce."

The court further cites Henderson Bridge Co. v. Kentucky, 166 U. S. 150, where the same contention was made, and wherein the court said:

"The fact that the tax in question was to some extent affected by the amount of tolls received, and therefore might be supposed to increase the rate of tolls and thus be a burden upon interstate commerce, was too remote and incidental to make it a tax upon the business transacted."

And, after citing Adams Express Co. v. Ohio State Auditor, 166 U. S. 185, the court said further: "The suggestion that such a tax on the cattle constitutes a tax on the lands * * * is purely fanciful."

In further answering the contention that such a tax was an invasion of the right of Congress to deal with the Indians, the court said:

"The unlimited power of Congress to deal with the Indians, their property, and commercial transactions, so long as they keep up their tribal organizations, may be conceded; but it is not perceived that local taxation, by a state or territory, of property of others than Indians would be an interference with congressional power. It was decided in Utah & Northern Railway Co. v. Fisher, 116 U. S. 28 (29: 542), that the lands and railroad of a railway company within the limits of the Fort Hill Indian reservation in the territory of Idaho was lawfully subject to territorial taxation, which might be enforced within the exterior boundaries of the reservation by proper process. The question was similarly decided in Maricopa & P. Railroad Co. v. Arizona Territory, 156 U. S. 347 (39: 447).

"The taxes in question here were not imposed on the business of grazing, or on the rents received by the Indians, but on the cattle as property of the lessees. and, as we have heretofore said that such a tax is too remote and indirect to be deemed a tax or burden on interstate commerce, so is it too remote and indirect to be regarded as an interference with the legislative power of Congress.

"These views sufficiently dispose of the objections urged against the power of the Legislative Assembly of Oklahoma to pass laws taxing property within the limits of the Indian reservations and belonging to persons not Indians."

Also, in Wagoner v. Evans, 170 U. S. 588, the same questions were raised and the same decision rendered, upon authority of Thomas v. Gay, supra.

In Montana Catholic Mission v. Missoula County, 200 U. S. 118, the exact questions

were presented that were presented in Thomas v. Gay and Wagoner v. Evans, supra, namely, the right to tax cattle grazed upon an Indian reservation under federal permission. Mr. Justice Peckham, who delivered the opinion, said:

"This court has heretofore determined that the Indians' interest in this kind of property situated on their reservation was not sufficient to exempt such property when owned by private individuals from taxation"—citing Thomas v. Gay and Wagoner v. Evans, supra, and repeating the following: "This court held that the tax put upon the cattle of the lessees was too remote and indirect to be deemed a tax upon the lands or privileges of the Indians."

In Gromer v. Standard Dredging Co., 224 U. S. 362, the United States had let a contract for dredging the harbor of San Juan, Porto Rico, a reservation of the United States being dredged for the benefit of the United States. The insular government sought to levy a property tax upon the boats, tugs, and machinery used in dredging the harbor. The company sought to enjoin the collection of the tax upon the ground that such a tax was, a burden upon the interference with the operation of a federal agency. The company contended also that the property had no taxable situs in Porto Rico. In answering these questions the court, through Mr. Justice McKenna, said:

"If Porto Rico had jurisdiction over the harbor area, it had jurisdiction to tax property which was situated in the harbor, no matter how engaged; and, being so situated, the validity of the tax upon it cannot be determined by an inquiry of the extent it may be benefited"—citing Thomas v. Gay and Wagoner v. Evans, supra.

The tax was sustained and the decree of the district court enjoining the collection of such tax was reversed, with directions to sustain the demurrer and dismiss the bill.

And, in Choctaw, etc., R. Co. v. Harrison, supra, the court reiterated and still adhered to the same doctrine, namely that a tax upon "* * * the coal at the pit's mouth is permissible according to many opinions of this court"—citing Thomas v. Union P. R. Co., supra; Union P. R. Co. v. Peniston, supra; Central P. R. Co. v. California, supra: Thomas v. Gay, supra.

Also, in Kansas Natural Gas Co. v. Haskell, 172 Fed. 545, on the question as to whether the lessees' share of the oil and gas after it had been extracted from the earth and separated from the royalties was then the private personal property of the companies and subject to its exclusive control,

the federal court said:

"On the contrary, it must be held he who by lawful right reduces to his possession mineral, gas, or oil has the same absolute right of property therein, with the same power of barter, sale, or other disposition, including, of necessity, the right of transportation and delivery under such reasonable rules and safeguards as the exigences of the case may demand and the state employ, as the farmer has of his corn, his wheat, or his stock, or the merchant of his wares, and such absolute right therein as the state cannot deny him. * * *"

Upon appeal by the state to the Supreme Court of the United States (Haskell v. Kansas Natural Gas Co., 224 U. S. 217-8) the court, through Mr. Justice Day, approved the above language of the United States district court by affirming the decree. The sole theory upon which the above conclusion is based and on which its soundness must rest is that when oil, gas, and ores are extracted from the earth, and separated from the royalties due the Indians, they then become so absolutely and exclusively the private property of the lessee that the state has no more power to prevent their sale and shipment than it has to prevent the sale and shipment of the farmer's corn, his wheat, and his stock, or the sale and shipment of the merchant's wares, and the very truth of the proposition refutes every argument against their bearing the same rate of taxes that the farmer's products and the merchant's wares must bear.

Also, in Shaffer v. Carter, 252 U. S. 37, decided March 1, 1920, the court said:

"The Oklahoma gross production tax, imposed on oil and gas producing companies, was intended as a substitute for the ad valorem property tax, and payment of it does not relieve the producer from taxation under the state income tax law."

Hence, the Supreme Court has expressly said what kind of a tax the Oklahoma "gross production tax" is.

In view of the foregoing authorities, there should remain no doubt as to the proper conclusion in the case at bar.

The principle that a state has the right to raise the necessary revenue for state government by a reasonable rate of tax upon private property having a situs within its jurisdiction (as was said in Gromer v. Dredging Co., supra), "no matter how engaged," has never been denied by the Supreme Court of the United States except as to property expressly exempt by law, but has been universally recognized by that court, not as a matter of grace merely, nor as an appropriate recognition of local rights or

conveniences, but as one of the underlying principles essential to the maintenance of our dual form of government. In other words, the right of a state to maintain a state government is as essential to the existence of our scheme of government as is the exercise of any other agency of government—state government being an essential wheel in the machinery of our dual government, to destroy which, by denying the right to raise revenue, would destroy the duality, thereby causing the whole framework to fall.

Other forces may constitute needed and appropriate agencies of the government, but the states and state governments are component elements of our government itself, our dual system of government; both elements must function or the dual scheme must fail. And, announced more than a century ago by the illustrious jurist, Mr. Chief Justice Marshall, in his masterly opinion in McCullough v. Maryland, 4 Wheat. 316-431, "the doctrine that a state may raise revenue by a tax on private property, though belonging to an agent of the government," has been so often repeated, reiterated, cited, and cross-cited, and followed in subsequent opinions, as will be seen from the authorities above cited, that it has become a plain, beaten line in our jurisprudence, and, having been followed for more than a century by the Supreme Court of the United States, we cannot feel justified in taking an opposite course. True, it was said by the same eminent jurist that "the power to tax meant the power to destroy." These words have been very frequently used with but faint comprehension of their import or appropriate application, and with no realization whatever of the far graver dangers in the converse of the proposition.

Those words, if true at all, in their fullest sense are true in theory only, so far as they relate to a "property tax"; there being other equalizing and regulatory principles in the philosophy of our government, such as "equal protection under the law", "due process of law", and other limiting forces against excessive taxes, double taxes, confiscatory taxes, etc., which effectually curb the excessive exercise of such power and prevent its harmful effects. As to an "occupation tax" by a state upon the right to exercise a federal agency, such a proposition is preposterous. No such power has ever been recognized and only upon an absurd conception of the distinct functions of our dual system has it ever been attempted.

There is a wide distinction between the taxation of the agency itself and the taxation of the private property of the agent. Thompson v. Union P. R. Co., 76 U. S 579.

There is a wider distinction between the mere taxing of an agency by a "property tax" and the control of such agency by a "license tax" or an "occupation tax", the payment of which being made a condition upon the right to operate the agency.

A state has no right whatever to control, restrict, or impair the free operation of a federal agency. The exercise of such power would mean the destruction of both. Being harmful to the one would necessarily be harmful to the other and to both.

The recognition of a few elementary principles would serve to solve and adjust such difficulties, viz.:

A state has no power to regulate or restrict the exercise of a federal agency.

A state has no power to impose an "occupation tax" or "license tax" upon the operation of a federal agency.

A state has power to raise revenue by a "property tax" upon all private property having a situs in the state, which the state is obligated to protect.

A state has power to impose a "property tax" upon the private property of a federal agent.

A state may have power, though it is questionable, to impose a "property tax" upon the value, commercially speaking, of a federal agency, a lease right, mine right, or other contract rights obtained from the federal government, if the taxable situs of such right were certain, but the actual situs of the value of a right obtained from the federal government is too uncertain, too indeterminate, for the value of such right, commercially speaking, to be considered as an element of value in making up the assessment rolls. And, besides, if its taxable situs were certain, even then the revenue derived therefrom would be of too slight a benefit to the state to justify the effect it would have upon the operation of the right itself, and also the harmful effects upon the state government when viewed in the light of our dual scheme of government.

However, the power of a state to tax the value of a government mining claim, or lease right, as such, was upheld in Forbes v. Gracey, and other authorities cited above. But such power was denied to this state in Indian Ter. Ill. Oil Co. v. State, supra, which, under the principles above stated, we believe to be the correct rule. And since then this state has not sought to include the value of the lease, as such, in making up the assessment rolls, and does not include such elements of value in the statute under consideration. But, while this is true as to the

lack of power of a state to tax the value of the lease right, as such, yet the state has power to tax the private property of a federal agent having an actual situs, and the exercise of such power does not rest upon the ground that the effect which such a tax might have upon the exercise of an agency "is too slight, too remote, too indirect, too fanciful", but upon the elementary principle that private property, having a situs within the state and receiving protection from the state, should bear its proportion of the expense of protection.

The contention made in this case, and which has been made in every kindred case, that the payment of the tax will materially affect the price the lessee will be able to pay to the "poor Indian" for the lease, or affect the percentage of royalties which go to the Indian, is bare of merit. There is not one lessee but who would eagerly pay the tax many times over, if refusal to do so meant the forfeiture of his right to the lease. Such contention, in the light of facts well known, bears no semblance of sincerity.

There are still other reasons for sustaining the statute under consideration:

In the case of United States Express Co. v. Minnesota, 223 U. S. 335, supra, every principle of law was decided that is presented in the case at bar. The statute under consideration there, which levied what it denominated a "gross receipts tax", was identical in every essential feature with the statute under consideration here. The question was first before the Supreme Court of Minnesota, 114 Minn. 346, wherein the court held:

"The state has a right to impose a tax upon property within its borders regardless of the fact that such property may be employed by its owners in interstate commerce.

"The gross earnings tax provided by R. L. 1905, sections 1013-1019, is not a tax upon the earnings of express companies, or upon the companies, or their right to engage in business, but is a tax upon their property within the state.

"A tax upon the property within the state of an express company engaged in interstate commerce, based upon its gross earnings within the state on interstate shipments, is not a regulati n of or interference with interstate commerce."

There being an appeal from the above decision of the Supreme Court of Minnesota to the Supreme Court of the United States, upon review of the judgment of the Minnesota court, the Supreme Court of the United States said:

"We find no error in the judgment of the Supreme Court of the state of Minnesota, and it is affirmed."

An analysis and comparison of the provisions of the Minnesota statute with the provisions of the Oklahoma statute will serve to accentuate the identity of principles involved.

In the Minnesota statute the tax is denominated "a gross receipt tax." The Oklahoma statute denominates it "a gross production tax." The Minnesota statute requires that express companies make reports to the State Auditor, showing: The name of the company, the nature of the company, the location of its principal office, the names and addresses of its managing agents in the state, the entire receipts, including all sums and charges whether actually received or not from business done in the state, the amount paid by such express company to railroads within the state for carrying its freight within the state, the entire receipts of the company for business done within the state, after deducting the amount paid to railroads for carrying its freight. The Oklahoma statute requires each party engaged in mining within the state to make certain reports showing: The location of the well or mine, the kind of mineral produced, the gross amount thereof, the actual cash value thereof at the place of production, the amount of royalty payable thereon, and whether such royalty is exempt by any law, state or federal, the facts on which said exemption is claimed.

The Minnesota statute provides that, in case of failure or refusal of any express company to make the reports required by law, "the State Auditor shall inform himself as best he may," and may require the officers of said company to be brought before him with their books and records for his inspection, in order that he may inform himself fully as to the true amount of "gross receipts," and provides, further, that the failure or refusal to attend and bring the books and records shall constitute a gross misdemeanor punishable by fine and imprisonment. The Oklahoma statute provides that, in case of failure or refusal of any mining company to make the reports required by law, the State Auditor shall have the power to require such company to furnish such additional information as he may deem necessary, and may require the attendance of witnesses and the furnishing of books and records for his inspection, in order that he may fully inform himself as to the amount and true value of the "gross products": and provides, further, that a failure or refusal to attend before him and produce the books and records of the company shall be certi-

fied to the district court, wherein the offender shall be dealt with as in contempt cases.

The Minnesota statute provides that the State Auditor, having ascertained the true amount thereof, shall assess a tax of 6 per cent. upon the "gross receipts." The Oklahoma statute provides that the State Auditor, having ascertained the true value thereof, shall collect a tax of 3 per cent. on the "gross products."

The Minnesota statute levies the tax upon the "gross receipts" from business done between points within the state. The Oklahoma statute levies the tax upon the "gross products" obtained from mines operated within the state.

The Minnesota statute levies the tax "in lieu of all taxes upon its property"—express company's property. The Oklahoma statute levies the tax "in full and in lieu of all taxes upon its property"—mining company's property. The Minnesota statute provides that the taxes, when collected, should be credited to the general revenue fund. The Oklahoma statute provides that when the gross production tax is collected, it should be credited to certain funds.

The Minnesota statute provides a penalty for nonpayment of such taxes, within 60 days after demand, of 10 per cent. thereof at the time and — per cent. a month for each subsequent month until the tax is paid. The Oklahoma statute provides for a penalty for nonpayment of such taxes when due of 18 per cent. per annum.

The Minnesota statute provides that the State Treasurer is authorized to distrain enough of the personal property of said defaulting express company to satisfy the taxes and penalty, and to sell such property for the taxes if the tax is not paid before the day of sale. The Oklahoma statute provides that the State Auditor is required to direct that a sufficient amount of the property of the mining company be sold upon execution to satisfy the taxes and penalties due.

The purpose of both statutes is the same, and the same result is obtained in each. There is not a thing required to be done, not a step required to be taken, under the Oklahoma statute that was not required under the Minnesota statute. There is not a legal principle involved in any step required to be taken under the Oklahoma statute that was not involved in a similar step required under the Minnesota statute, except that the Oklahoma statute is by far the less rigid of the two.

In Forbes v. Gracey, supra, the Supreme Court of the United States had under consideration the statute of Nevada known as the "Net Proceeds Tax." In every essential principle as to the purpose of the taxes— the species of property upon which it was levied, the species of tax levied upon it, the steps required to be taken in order to ascertain the amount and value of the property, the steps taken in the collection of the taxes, and the steps taken for enforcement of penalties for nonpayment of taxes, were exactly the same as under the Minnesota statute and under the Oklahoma statute. The same contentions were made in order to escape payment of the Nevada tax that were made in order to escape the payment of the Minnesota tax, and are here made in order to escape the Oklahoma tax. The Supreme Court of the United States, in disposing of such contentions, among other things, said:

"In regard to the taxing of this personal property and the mode of collecting it by sale as provided in the section last cited, it does not seem to us that there can be any reasonable ground for asserting that the United States has any interest in the tax or in the sale of the property taxed."

And, as a final disposition of the questions presented and contentions made, the court said:

"In view of its importance we should postpone the decision until next term, if the questions presented were either doubtful or difficult of solution. We think a very few words—all we can give to the subject at this late day—will show that it is neither." Forbes v. Gracey, supra.

There were two reasons which prompted the court deciding the case at that time: 1st. Because of its importance to the mining interests of the Pacific states. 2nd. Because the court did not consider the questions presented either doubtful or difficult of solution; hence the decision was rendered in order that it might constitute a precedent to be followed by all the Pacific states.

Upon the foregoing authorities we hold that the statute under consideration is valid, and that the tax therein levied is purely a "property tax", and that the protestant's rights and the rights of all others similarly situated are adequately protected, even more so than was true under the Minnesota statutes in U. S. Express Co. v. Minnesota, supra, against discrimination as to higher rates according to value than other property within the state is taxed; and that the lessee's private, personal share of the mine products, after same are taken from the ground, separated from the royalty due the Indians, and reduced to lessee's private possession and absolute control, as said in Haskell v. Kansas Nat. Gas Co., supra, "the same as a farmer has of his corn, his wheat, or his stock, or the merchant of his wares", it is then subject to the same rate of "property tax" that the farmer's corn, his wheat

and his stock, and the merchant's wares are made to bear.

Also, that the plants, mills, smelters, and machinery, as said in Gromer v. Dredging Co., supra, "no matter how engaged", are subject to the same rate of property tax which other property bears.

As to the question whether the value of protestant's lease, as such, is considered as an element in the assessment, or the question as to whether the commercial value of the lease itself, as such, could be taxed at all, that is not specifically raised in the instant case, but, inasmuch as the statute has been assailed on that ground in other cases, and inasmuch as the question may be considered indirectly involved in the case at bar, we deem it proper to point out and hold that such element of value is not intended by the statute to be included, nor has the State Auditor included same, in estimating the taxable value of protestant's property, nor of any other property occupying a like status.

The lease, as such—that is, the commercial value of all leases upon restricted Indian lands—is considered as exempt by law under the authority of Indian Ter. Ill. Oil Co. v. State, supra, and is therefore not included.

The provision of the statutes for including the value of leases in making up the assessment rolls applies only to leases upon unrestricted lands not under the supervision of the government, and is not intended to apply, and does not apply, to leases upon restricted lands under governmental supervision.

The order of the State Board of Equalization overruling the protest is affirmed.

Justices KANE and MILLER dissent. All other Justices concur.