**In re INITIATIVE PETITION NO. 315, STATE QUESTION NO. 553.**

No. 56115.

Supreme Court of Oklahoma.

Feb. 5, 1982.
Supplemental Opinion on Rehearing
May 20, 1982.

Miller & Dollarhide by George Miller and W. J. Winterstein, Jr., Oklahoma City, for contestants.

Crowe, Dunlevy, Thweatt, Swinford, Johnson & Burdick by John W. Swinford, D. Kent Meyers, Barbara Snow Gilbert, Oklahoma City, and C. H. Spearman, Jr., Edmond, for proponents.

HODGES, Justice.

The validity of the petition, sufficiency of subscribed signatures, and length of the circulation period of the Horse Racing Petition, Initiative Petition No. 315, State Question No. 553, have been challenged. The proceeding was ordered bifurcated by this Court to determine the validity of the petition before conducting an evidentiary hearing concerning the number and sufficiency of the signatures.

1. Section 7 of the petition imposes a tax on gate receipts and pari-mutuel tickets:

The following taxes are hereby imposed:

(a) A tax of ten percent (10%) of the amount received by any licensee on tickets for admission to the grounds where such horse races or meetings are held or conducted. All taxes levied herein on admission tickets shall be paid to the city in which the track is located. If a track is not located within the city limits, taxes levied on admission tickets shall be paid to the county in which the track is located.

(b) A tax of not less than twelve percent (12%) or more than eighteen percent (18%) on the proceeds from the sale of pari-mutuel tickets. The tax shall be divided into three equal parts with one-third to be retained by the licensee; one-third held by licensee as trustee to be distributed as purses for participating horses and one-third to be paid by the

Four attacks are made on the validity of the petition:

1) The imposition of a tax on gate admissions and a tax on sale of pari-mutuel tickets, proposed by § 7 of the petition,[1] violates the Okla.Const. art. 10 §§ 14, 15, 19, 20, and art. 5 § 55.

2) Section 9 of the petition[2] which proposes a county option vote violates the Okla.Const. art. 5 § 5.

3) The number of valid signatures is to be determined by the votes cast for the state office of presidential elector at the November 4, 1980 election rather than the gubernatorial election held in November of 1978.

4) Proponents circulation of the petition exceeded the ninety-day period prescribed by 34 O.S.Supp.1973 § 8.

### I and II

The contestants urge that the unconstitutionality of §§ 7 and 9 renders the petition invalid. No assertion is made that any of the procedural steps before submission of the petition violate the constitution.[3] The assault on the constitutionality of §§ 7 and 9 of the petition is initially countered by the defense that question is premature.

Until *In re Supreme Court Adjudication of Initiative Petitions in Norman, Oklahoma,* Numbered 74–1 and 74–2, 534 P.2d 3, 8

Commission to the State of Oklahoma general revenue fund. One-third of all taxes levied on pari-mutuel wagers shall be paid to the Commission within a reasonable period of time after the close of each day's racing program.

2. Section 9 of the petition relates to county option:

No pari-mutuel racetrack shall be licensed in any county unless the majority of the voters of said county, voting at an election held for that purpose, approve the conducting of pari-mutuel horse racing in said county. An election shall be called upon the filing of a petition with the county election board containing not less than ten percent (10%) of the qualified voters within any such county.

3. *In re Initiative Petition No. 314, State Question No. 550,* 625 P.2d 595 (Okl.1980).

(Okl.1975), the constitutionality of the subject matter of a proposed initiative petition was not considered until after the proposition was passed by the voters.[4] The rule was modified in the *Norman Petitions.* The court held that under 34 O.S.Supp.1973 § 8, if constitutional questions are raised, the constitutionality of the procedure, form, and subject matter may be considered if the court resolves that the determination could prevent an expensive and unnecessary election.

▪ The quintessential question is whether a determination of the constitutionality of the subject matter of §§ 7 and 9 could prevent a costly and useless election. We find that it could. Because the provisions of §§ 7 and 9 appear to be integral parts of the petition, we do not view them as severable. We, therefore, will answer the constitutional challenges to the subject matter of §§ 7 and 9.

The validity of the attempted imposition of a tax on admission tickets is challenged by contestants urging that it is an attempt by the state to levy a tax for county or city purposes. The tax on proceeds of pari-mutuel tickets and allocation to the Oklahoma Horse Racing Commission is attacked alleging it is a tax imposed for private purposes. Both of the proposed taxes is challenged because contestants assert that they do not conform: 1) to the constitutional requirements that their purposes and sums be distinctly specified; and 2) the constitutional procedure for appropriation of money. It is asserted that § 7 violates the Okla.Const. art. 10, §§ 14, 15, 19, 20, and art. 5, § 55. Contestants also contend that § 9 of the petition is infirm because it violates the Okla.Const. art. 5, § 5.[5] Section 9 provides for an election to permit county option if a petition is filed containing not less than ten percent of the signatures of the qualified voters in the county. The contestants contend that 16% of the legal voters are required to initiate a countywide petition under art. 5, § 5.

Contestants charge that the tax imposed on gate admissions by § 7A violates art. 10, § 20, because it is a tax imposed by the state for county or city purposes.[6] Proponents counter with the argument that § 7A does not directly impose or levy a tax, nor does it affect the paying out of state funds. Proponents argue that in spite of the express language, "the following taxes are hereby imposed," no tax imposition or levy is made, because in order for § 7 to become effective in a county, a favorable county option vote must take place pursuant to § 9 of the petition. Pursuant to art. 10, § 20, the state may not levy taxes for local purposes.[7]

In the instant case, however, the tax on gate admissions provided for in § 7A of the petition has no effect even if the petition is adopted by a statewide vote of the people until a favorable county option vote takes place in a particular county. The tax provided by § 7A authorizes a particular county to levy a tax as the result of the favorable county option vote on whether a county will have parimutuel horse racing.

The contestants contend that the "tax" authorized by § 7B of the petition is imposed for private purpose in contravention

4. *Oklahomans for Modern Alcoholic Beverage Controls v. Shelton,* 501 P.2d 1089 (Okl.1972); *In Re Initiative Petition No. 259, State Question No. 376,* 316 P.2d 139 (Okl.1957); *In Re Initiative Petitions Nos. 112, 114, 117, 118,* 153 Okl. 205, 6 P.2d 703 (1931); *McAlister v. State,* 96 Okl. 143, 221 P. 779 (1923); *Threadgill v. Cross,* 26 Okl. 403, 109 P. 558 (1910).

5. The Okla.Const. art. 5, § 5 provides in pertinent part:
"* * * The requisite number of petitioners for the invocation of the initiative and referendum in counties and districts shall bear twice, or double, the ratio to the whole number of legal voters in such county or district, as herein provided therefor in the State at large."

6. The Okla.Const. art. 10, § 20 provides:
"The Legislature shall not impose taxes for the purpose of any county, city, town, or other municipal corporation, but may, by general laws, confer on the proper authorities thereof, respectively, the power to assess and collect such taxes."

7. *City of Ardmore v. Excise Bd. of Carter County,* 155 Okl. 126, 8 P.2d 2 (1932); *Spann v. State,* 152 Okl. 60, 3 P.2d 861 (1931).

of the Okla.Const. art. 10, §§ 14, 15.[8] Contestants urge that because paragraph B of § 7 provides for two-thirds of the "tax" to be retained by the licensee, and one-third as trustee to be distributed as purses, the tax is not for a public purpose within the meaning of art. 10, § 14, and amounts to a gift or donation of public funds to private persons contrary to art. 10, § 15. Proponents refute this assertion by alleging that the term "tax" as used in paragraph B of § 7 is not synonymous with the term "taxes" as used in art. 10, § 14; the two-thirds of the proceeds retained by the licensee are not public funds; and, therefore, art. 10, § 15 is not applicable.

It should be noted that, as is the case of paragraph A of § 7, paragraph B of § 7 does not directly impose the tax upon adoption of the petition. As a practical matter, nothing is imposed under paragraph B unless and until a particular county has a favorable county option vote on the issue of whether to have parimutuel horse racing. No tax is directly imposed by the operation of the terms and provisions of paragraph B of § 7.

▇ From an overall reading of paragraph B of § 7, it is obvious that only one-third of the total proceeds are intended to be paid to the State of Oklahoma general revenue fund. It is obviously the intent of paragraph B to allow the licensee to retain two-thirds of the proceeds: one-third to be held in trust to be distributed as purses for the participating horses; and the other one-third to be used by the licensee as he sees fit. The two-thirds retained by the licensee is in the nature of a charge or a fee rather than of a tax. As such, the two-thirds is

not a "tax" within the meaning of art. 10, § 14 and the case authorities construing that section of the constitution.[9]

▇ Paragraph B of § 7 authorizes a pari-mutuel betting fee in an amount not less than four nor more than six percent, which is retained by the licensee who conducts the pari-mutuel betting. The charging of a pari-mutuel betting fee is part of the general practice of pari-mutuel betting.[10] The exercise of the police power of the state, whether by the legislature, or by the people through the statewide initiative process, extends to the prohibition, suppression or regulation of gaming or gambling.[11] The police power extends to regulation of minimum and maximum amounts to be charged by a licensee as a pari-mutuel betting fee. This is the effect of paragraph B of § 7 concerning the first one-third of the proceeds, and, as such, it is not a "tax" within the meaning of art. 10, § 14. Likewise, the second one-third of the proceeds referred to in paragraph B, which is held by the licensee as trustee to be distributed as purses for participating horses, is a charge or fee rather than a "tax" within the meaning of art. 10, § 14. The legislative power extends to imposing a charge or fee for distribution as purses as part of the regulation and promotion of pari-mutuel horse racing. The remaining one-third, referred to in paragraph B of § 7, is paid to the State of Oklahoma general revenue fund, and, as such, becomes "public funds" subject to expenditure and appropriation by the legislature. Only this latter one-third of the proceeds referred to in paragraph B are "public funds" within the meaning of

8. The Okla.Const. art. 10, §§ 14, 15 provides in pertinent part as follows:

"§ 14 Taxes shall be levied and collected for public purposes only . . ."

"§ 15 . . . nor shall the state . . . make any donation by gift . . . by tax or otherwise, to any company, association or corporation."

9. *Vette v. Childers*, 102 Okl. 140, 228 P. 145 (1924); *V.F.W. v. Childers*, 197 Okl. 331, 171 P.2d 618 (1946).

10. See, *Donovan v. Eastern Racing Assoc.*, 324 Mass. 393, 86 N.E.2d 903 (1949).

11. *Nelson v. State*, 37 Okl.Cr. 90, 256 P. 939 (1927); *Prickett v. State*, 88 Okl.Cr. 213, 201 P.2d 798 (1949). See also *State ex rel. Grimes v. Bd. of Com'rs.*, 1 P.2d 570, 572 (Nev.1931), wherein it is stated:

"Gaming as a calling or business is in the same class as the selling of intoxicating liquors in respect to deleterious tendencies. The state may regulate or suppress it without interfering with any of those inherent rights of citizenship which it is the object of government to protect and secure."

art. 10, § 15.[12] Therefore, because the two-thirds are not "taxes" within the meaning of art. 10, § 14 nor "public" or "state" funds within the purview of art. 10, § 15, distribution of the monies in accordance with paragraph B does not contravene the Oklahoma Constitution.

Contestants allege that both paragraphs of § 7 are invalid because the reference to "taxes" does not meet: the constitutional requirements that their purposes and sums be distinctly specified; and the constitutional procedure for appropriation of money. The Okla.Const. art. 10, § 19 provides that every act levying a tax shall "specify distinctly the purpose for which said tax is levied" and that a tax levied and collected for one purpose shall not be devoted to another purpose.[13]

In *McGannon v. State,* 33 Okl. 145, 124 P. 1063 (1912), it was held that the "purpose" requirement of art. 10, § 19 was intended to apply only to annual recurring taxes imposed generally upon the entire property of the state, and not to a special tax. The *McGannon* decision was followed in *Ex Parte Marler,* 140 Okl. 194, 282 P. 353 (1929). Contestants contend that the purpose requirement of art. 10, § 19 is applicable to the "taxes" referred to in § 7 of the petition, citing *Meyer v. Lynde-Bowman-Darby Co.,* 35 Okl. 480, 130 P. 548 (1913). A review of the *Myers* case indicates that the tax in question was an annual recurring tax as opposed to a special tax. Subsequently, in *State ex rel. Bd. of Com'rs. of Harmon County v. Oklahoma Tax Comm.,* 191 Okl. 155, 127 P.2d 1052 (1942), it was held that the second requirement of § 19, that a tax levied for one purpose shall not be devoted to another purpose, was not limited in its application to only annual recurring taxes

such as ad valorem taxes. The opinion in the *Harmon County* case distinguishes the earlier decision in *McGannon* on the basis that the decision in *McGannon* did not deal with the second requirement of § 19 but was limited to the first requirement, that a purpose must be stated.

In this instance, it does not appear that any taxes imposed under the authority of § 7 of the petition would be annually recurring taxes, but, rather, would be in the nature of special taxes. Under the rule set forth in *McGannon* as explained or distinguished by this Court's later decision in the *Harmon County* case, it appears that the purpose requirement of art. 10, § 19 would be inapplicable. Even though the *Harmon County* case modifies the earlier *McGannon* decision, the net effect is that an act levying a special tax does not have to set forth a purpose, but if a specific purpose is stated the tax cannot be devoted to any other purpose. Additionally, it should be noted that based upon the previous discussion regarding challenges to § 7 of the petition, premised on art. 10, §§ 14, 15, § 7 does not impose or levy any tax. At most, it is a legislative authorization for taxation if a favorable vote is obtained in a county on the question of pari-mutuel betting.

Contestants argue that the provisions of § 7 contravene the requirements of the Okla.Const. art. 5, § 55,[14] because § 7 fails to distinctly specify the sum of money being appropriated. It is apparent, based on the reasons previously given, that § 7 of the petition does not appropriate public funds, and that art. 5, § 55 is not applicable.

The contestants claim that the county option vote provision, § 9 of the petition, violates the Okla.Const. art. 5, § 5 which requires signatures of 16% of the votes in

---

12. *V.F.W. v. Childers, supra,* note 9; *Hawks v. Bland,* 156 Okl. 48, 9 P.2d 720 (1932).

13. The Okla.Const. art. 10, § 19 provides in pertinent part:
 "Every act enacted by the Legislature, ... levying a tax, shall specify distinctly the purpose for which said tax is levied ..."

14. The Okla.Const. art. 5, § 55 provides in pertinent part:

"No money shall be paid out of the treasury of this state, nor any of its funds, nor any of the funds under its management, except in pursuance of an appropriation by law, ... and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied."

the county to invoke initiative petition procedures in the county. Contestants cite no case authority in which it has been held that a county option vote such as that provided for in § 9 of the proposed petition amounts to "invocation of the initiative" with the purview of art. 5, § 5. Contestants cite *Hughes v. Bryan*, 425 P.2d 952 (Okl.1967) which defines the initiative process in the first syllabus as follows:

"Initiative means the power of the people to propose bills and laws, and to enact to reject them at the polls, independent of legislative assembly . . . ."

Based on this, contestants argue that the county option vote under § 9 of the petition, amounts to the exercise of local legislative power, or law-making function.

 The voters of a county could not be means of the county initiative procedures legalize pari-mutuel horse race betting in the absence of statewide legislative action to remove statewide criminal prohibitions. In the absence of either: the legislative repeal of the state statute prohibiting horse race betting; a statewide initiative repealing the state statutory prohibition on horse race betting; the voters of a county have no independent authority or power to enact by means of the initiative process a county ordinance to legalize horse race betting in that county. The county initiative process does not extend to this subject. Until the proposed statewide initiative petition is adopted, legalizing pari-mutuel betting and providing for county option vote, the county has no authority to conduct a county election on the question. Consequently, the county option vote provided in § 9 of the petition does not fall within the definition of the initiative process enunciat-ed in *Hughes v. Bryan, supra,* because it cannot be acted upon at the county level in the absence of legislative authorization at the state level.[15]

### III

The contestants assert that the number of valid signatures is to be determined by the votes case for the office of presidential elector on November 4, 1980. The official records of the State Election Board reflect that 1,172,303 votes were cast for this office. The requisite number of signatures is 93,784, based on the 1980 election. Proponents contend the number of signatures should be determined by the number of votes cast for the office of Governor at the general election held in November, 1978, which would require 62,194 valid signatures.

The ultimate question is whether the time of circulation of the petition, September 1, 1980, or the date of filing the petition, December 1, 1980, is the determinative date of the last general election as mandated by the Okla.Const. art. 5, § 2.[16]

 The Okla.Const. art. 5, § 2 provides that eight percent of the legal voters shall have the right to propose any legislative measure based on the total number of votes cast at the last general election for the state office receiving the highest number of votes. The contestants rely on *In re Petition No. 281*, 434 P.2d 941 (Okl.1967) in support of the assertion that the November 4, 1980, election is the last general election as defined by art. 5, § 2. In *Petition No. 281*, the Court held that the constitutional phrase, "the total number of votes cast at the last general election for the State office

---

15. For a discussion of the police power of the State encompassing the prohibition, suppression or regulation of gaming, see cases cited in note 11, supra.

16. It is provided by the Okla.Const. art. 5, § 2: "The first power reserved by the people is the initiative, and eight per centum of the legal voters shall have the right to propose any legislative measure, and fifteen per centum of the legal voters shall have the right to propose amendments to the Constitution by petition, and every such petition shall include the full test of the measure so proposed. The second power is the referendum, and it may be ordered (except as to laws necessary for the immediate preservation of the public peace, health, or safety), either by petition signed by five per centum of the legal voters or by the Legislature as other bills are enacted. The ratio and per centum of legal voters hereinbefore stated shall be based upon the total number of votes cast at the last general election for the State office receiving the highest number of votes at such election."

receiving the highest number of votes at such election," refers to the last general election which precedes the filing of the petition which contains the required number of signatures. The proponents argue that, pursuant to *Shelton v. Lambert,* 399 P.2d 467 (Okl.1965), the last general election means the general election preceding the *circulation* and filing of the petition. *Shelton* was discussed and distinguished in *Petition No. 281.* The Court held that, because the parties had stipulated that a certain election was the preceding election, the case was not in point.[17]

The proponents assert that *Petition No. 281* can be distinguished. They contend: (1) The rule is unworkable because at the time circulation is begun, it would be impossible to determine how many signatures are necessary, and (2) in *Petition No. 281* the computation of number of signatures based on the later election resulted in reducing the number of signatures required to place the question on the ballot. We are not persuaded by these arguments. The time of circulation and subsequent filing is within the control of the proponents of the proposal. Any uncertainty can be avoided by scheduling the circulation and filing prior to an ensuing general election, or postponing the circulation until after a pending general election. The fact that the use of the rule enunciated in *Petition No. 281* results in an increase instead of a reduction is not relevant to the construction of art. 5, § 2.

We find the case of *Petition No. 281* is dispositive and that the minimum number of valid signatures required on Petition No. 315 before it may be submitted to a vote of the people is 93,784, which represents eight percent of the votes cast for the office of presidential elector at the general election held on November 4, 1980.

## IV

Contestants contend that the circulation period for Petition No. 315 was more than ninety days and, therefore, the petition is invalid on its face.[18] The basis for this contention is that the Attorney General timely approved the ballot title without change; no appeal was possible; and the

---

17. In *In Re Initiative Petition No. 281,* 434 P.2d 941, 944 (Okl.1967), the Court said:

 "Provision in Section 2 of Article V of the Oklahoma Constitution relating to initiative petition, requiring that in order for the same to be sufficient it must be signed by a number of legal voters equal to at least fifteen per centum of 'the total number of votes cast at the last general election for the State office receiving the highest number of votes at such election,' refers to the last general election preceding the filing of such petition which has thereon the requisite number of signatures."

18. It is provided by 34 O.S.Supp. 1973 § 8 in pertinent part:

 "When a citizen or citizens desire to circulate a petition initiating a proposition of any nature, whether to become a statute law or an amendment to the Constitution, or for the purpose of invoking a referendum upon legislative enactments, such citizen or citizens shall, when such petition is prepared, and before the same is circulated or signed by electors, file a true and exact copy of same in the office of the Secretary of State and, within ninety (90) days after such filing of an initiative petition, the signed copies thereof shall be filed with the Secretary of State, but the signed copies of a referendum petition shall be filed with the Secretary of State within ninety (90) days after the adjournment of the Legislature enacting the measure on which the referendum is invoked. The electors shall sign their legally registered name, their address, and the name of the county in which they reside. Any petition not filed in accordance with this provision shall not be considered. When the signed copies of a petition are timely filed, the Supreme Court of the state shall make or cause to be made a physical count of the number of signatures appearing on the petition. Upon the order of the Supreme Court it shall be the duty of the Secretary of State to forthwith cause to be published, in at least one newspaper of general circulation in the state, a notice of such filing and the apparent sufficiency or insufficiency thereof and notice that any citizen or citizens of the state may file a protest to the petition or an objection to the count made by the Supreme Court of the state, by a written notice to the Supreme Court of the state and to the person or persons filing the petition, said protest to be filed within ten (10) days after publication...."

90-day period could not be extended.[19] The applicable statute, 34 O.S.Supp. 1975 § 10(A),[20] provides that any person who is dissatisfied with the wording of a ballot title may appeal to this Court within ten (10) days after it is filed by the Attorney General with the Secretary of State.

The proponents filed the petition with the Secretary of State, and the ballot title with the Attorney General for precirculation approval on August 18, 1980. The Attorney General approved the ballot title August 21, 1980. After circulation, on December 1, 1980, the petition was filed with the Secretary of State. The proponents rely on § 10(A) for the proposition that the circulation period did not commence until September 1, 1980, ten days after the expiration of the appeal time. The basis for this position is that *any* dissatisfied person had ten days to appeal from the approval of the ballot title. According to the proponents' calculations, the 90-day period of time expired Saturday, November 29, 1980, and the petition was timely filed on the next business day, Monday, December 1, 1980. We agree.[21] The 90-day period for circulation does not begin until the proposed title has been reviewed by the Attorney General, the 10-day appeal period has expired, and any appeals timely filed, exhausted.

### V

The parties have not raised the issue of the sufficiency of the ballot title, and the general rule precludes consideration of issues which have not been previously raised.[22] However, when questions of a general public nature are involved, which affect the state at large, the people of the state become indirect parties and their interests must be protected to prevent a possible "practical injustice" even if the person who might have objected is silent.[23]

The ballot title must contain the gist of the proposition in one hundred fifty words or less couched in language which may be easily understood by people not engaged in the practice of law.[24] The ballot title submitted to popular vote by the electorate must be neither deceptive nor misleading in order to permit the voters to reach an informed decision.[25]

It is with these principles in mind that we feel constrained to amend the ballot title. The ballot title provides ... "for a *tax* on pari-mutuel wagers; providing for distribution of *taxes* collected ..." The

---

19. The time for the Attorney General's approval is dictated by 34 O.S.Supp. 1975 § 9(B):
"Within three (3) days after the filing of such copy and ballot title with the Attorney General, he shall, in writing, notify the Secretary of State whether or not the proposed ballot title is in legal form and in harmony with the law. Should such ballot title not be in proper form, in the opinion of the Attorney General, it shall be his duty, within said three (3) days, to prepare and file a ballot title which does conform to the law."

20. Appeals upon the question of ballot title are determined by 34 O.S.Supp. 1975 § 10(A):
"Any person who is dissatisfied with the wording of a ballot title may, within ten (10) days after the same is filed by the Attorney General with the Secretary of State as aforesaid, appeal to the Supreme Court by petition in which shall be offered a substitute ballot title for the one from which the appeal is taken. Upon the hearing of such appeal, the court may correct or amend the ballot title before the court, or accept the substitute suggested, or may draft a new one which will conform to this chapter."

21. *In Re Question No. 377, Initiative Petition No. 260,* 299 P.2d 532 (Okl.1956). See also 34 O.S.Supp. 1975 § 10(A).
*In Re State Question No. 541, Initiative Petition No. 310,* 601 P.2d 103 (Okl.1979). See also Op.Atty.Gen.No.80–116 (June 16, 1980).

22. *Helfinstine v. Martin,* 561 P.2d 951, 960 (Okl. 1977).

23. *Murdock v. Ward,* 178 U.S. 139, 149, 20 S.Ct. 775, 779, 44 L.Ed. 1009, 1013 (1899); *Lipscomb v. State Ind. Comm.,* 199 Okl. 597, 188 P.2d 841, 842 (1948); *In Re Initiative Petition No. 10 of Oklahoma City,* 186 Okl. 497, 98 P.2d 896, 897 (1940); *Magnolia Petroleum Co. v. State,* 175 Okl. 11, 52 P.2d 81, 83 (1935); *Massachusetts Nat. Bank v. Shinn,* 163 N.Y. 360, 57 N.E. 611, 612 (1900).

24. 34 O.S.Supp. 1975 § 9(A).

25. *Pierce v. Cartwright,* 638 P.2d 450 (Okl. 1981); *Arthur v. City of Stillwater,* 611 P.2d 637, 643 (Okl.1980).

reference to taxes standing alone may be misleading as explained in Propositions I and II, supra. Paragraph B of § 7 actually refers to both *taxes* and *fees* collected, and with this modification the following ballot title is adopted:

## Ballot Title

### Initiative Petition No. 315

### State Question No. 553

THE GIST OF THE PROPOSITION IS AS FOLLOWS:

Shall a statute

CREATING THE OKLAHOMA HORSE RACING COMMISSION; PROVIDING FOR COMPOSITION, APPOINTMENT, TERMS OF OFFICE AND COMPENSATION OF THE COMMISSION; AUTHORIZING PARI–MUTUEL WAGERING ON HORSE RACING; GRANTING THE COMMISSION FULL REGULATORY AUTHORITY OVER HORSE RACING WHERE PARI–MUTUEL WAGERING IS CONDUCTED AND PARI–MUTUEL WAGERING THEREON; PROVIDING FOR LICENSING OF RACE TRACKS WHERE PARI–MUTUEL WAGERING IS CONDUCTED; ESTABLISHING A TAX ON GATE ADMISSIONS AND A TAX AND FEES ON PARI–MUTUEL WAGERS; PROVIDING FOR DISTRIBUTION OF TAXES AND FEES COLLECTED; REQUIRING RECORD KEEPING BY LICENSE HOLDERS; PROVIDING FOR COUNTY OPTION; AND DIRECTING THE LEGISLATURE TO ENACT LAWS GIVING EFFECT TO THE STATUTE,

be adopted by the people?

YES—FOR THE STATUTE

NO —AGAINST THE STATUTE

## VI

This matter is referred to a Referee of this Court to conduct an evidentiary hearing to determine factual issues which relate to the number and sufficiency of the signatures on the petition.

IRWIN, C. J., BARNES, V. C. J., and LAVENDER, SIMMS, DOOLIN, HARGRAVE, JJ., concur.

OPALA, J., concurs in result.

OPALA, J., concurring in result:

My views with respect to the legal conformity of the Initiative Petition No. 315—here under consideration—differ from those of the court on three distinct points. Because I advocate that we return to abandoned case law of yesteryear and overrule most recent precedent, I would give prospective effect to the course I wish to take. The change I propose would not apply to this proceeding but only to cases that will follow it. It is for this reason that I must dissent from the court's pronouncement, although I do concur in its judgment *only insofar* as it holds that inasmuch as Petition No. 315 meets present-day legal requirements, it is not vulnerable to protestants' *procedural* challenges.

## I.

In our constitutional order courts will not pass upon the validity of legislation *in advance of a complaint for its adversarial testing by one who is injured by its operation.* The party who invokes the power to annul legislation for failure to comply with our fundamental law "must be able to show not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement".[1] Mindful of this principle we declined—as early as 1910—to entertain attacks launched on the constitutional validity of measures being proposed for adoption by means of an initiative peti-

---

**1.** *Commonwealth of Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 [1923]; *Poe v. Ullman*, 367 U.S. 497, 505, 81 S.Ct. 1752, 1756, 6 L.Ed.2d 989 [1961]; *Ash-* *wander v. Tennessee Valley Authority*, 297 U.S. 288, 341, 56 S.Ct. 466, 482, 80 L.Ed. 688 [1935] (Brandeis, J., concurring).

tion. *Threadgill v. Cross.*[2] We recognized that premature judicial testing of proposed measures would invade the legislative prerogative "to determine what laws shall be passed, leaving it to the other departments to question or determine the validity of such laws only when they come to be enforced against some one whose rights they affect."[3] The court's deference to self-imposed abstention—a rule with deep historical roots derived from the tripartite character of our government—came to an end in 1975 when the opinion *In re Supreme Court Adjudication, etc.* freed us from the strictures.[4] Because I so clearly perceive grave danger to our constitutional system from the risky enterprise of pronouncing abstract opinions upon hypothetical questions formulated in advance of the law's adoption by those with selfish interests in proposing or opposing measures,[5] I would return the court to the teaching of *Threadgill* and its progeny.[6] I must therefore abstain from joining in the view that the proposed measure is impervious to attack on constitutional grounds. On this issue—which I believe to have been prematurely raised—I express *no view.*

**2.** 26 Okl. 403, 109 P. 558 [1910].

**3.** *Threadgill v. Cross,* supra note 2, 109 P. at 563.

**4.** *In re Supreme Court Adjudication, etc.,* Okl., 534 P.2d 3, 8 [1975].

**5.** The dangers from premature judicial testing of proposed measures were correctly assessed in *Threadgill v. Cross,* supra note 2, 109 P. at 562, where this court stated: "We have not overlooked the argument that if the proposed amendment in the case at bar will be void because in conflict with any compact between the state and Congress, authorized by the federal Constitution, and if the Secretary of State may not refuse to file the petitions, a great expense will be incurred to the people of the state in holding a useless election. *The same argument could be applied with equal, if not greater force, to sustain the right of the courts to enjoin the enactment of any void act of the Legislature, because it not infrequently happens that a Legislature consumes much time and incurs much expense to the state in passing laws which they think to be valid, but which the courts determine at the instance of some interested suitors whose rights have been*

## II.

Art. 5 § 2, Okl.Const. provides that legislative or constitutional measures to be proposed by the initiative must be supported by a prescribed percentage of the "legal voters." That percentage is to be "based upon the total number of votes cast *at the last general election* ". [Emphasis added]. A like provision, which is contained in Art. 18 § 4(b), Okl.Const., governs municipal initiative and referendum petitions. At issue here is the meaning of the phrase "at the last general election", as it is applied to an initiative whose pre-circulation filing was effected less than 90 days before the next general election and whose post-circulation submission came after such election. In a 1965 case, *Shelton v. Lambert,*[7] we held that the quoted phrase means the general election which next precedes the pre-circulation filing of the petition. Two years later we rejected this view by pronouncing that the term "last general election", as employed in Art. 5 § 2, Okl.Const., refers to the election that occurs before the post-circulation filing of the petition.[8]

I would return us to the 1965 pronouncement in *Shelton.* The post-*Shelton* change creates uncertainty and encourages specula-

*encroached upon to be invalid.* It may be that a government all of whose powers are administered by one department may be administered with less expense than a government of the kind existing in this state and in the other states of the Union, in which the powers are exercised by different departments; but, if so, it must be presumed that the people in adopting the present form of government did so with knowledge of that fact and notwithstanding preferred that the powers of their government be administered by these separate and independent departments..." [emphasis added].

**6.** *McAlister v. State,* 96 Okl. 143, 221 P. 779 [1923]; *McAlister v. State,* 95 Okl. 200, 219 P. 134, 33 A.L.R. 1370 [1923]; *In re Initiative Petitions,* 153 Okl. 205, 6 P.2d 703 [1931]; *In re Initiative Petition No. 259 etc.,* Okl., 316 P.2d 139, 146 [1957].

**7.** *Shelton v. Lambert,* Okl., 399 P.2d 467, 470 [1965].

**8.** *In re Initiative Petition No. 281, State Question No. 441,* Okl., 434 P.2d 941, 952 [1967].

tion and gamesmanship. What is worse, it virtually bars proponents unwilling to take a gamble on the number of signatures that will be needed from invoking the power of initiative within 90 days of every general election. In short, the people's power to propose laws [9] is severely restrained by a judicial pronouncement that requires proponents of a measure to wait 90 days—until after the next general election—to determine with certainty the number of signatures the constitution requires them to have for a valid exercise of power that is *expressly reserved* to the people by *their* fundamental law. The post-*Shelton* rule leaves the people's precious right to guesswork and gamble, with those unwilling to take a chance being virtually barred from action and forced to await the results of the next election.

The constitutional power of the electorate to initiate law surely is watered down, if not impermissibly burdened, when circulation cannot be begun *at any time* with *absolute* certainty as to the number of signatures required to make the efforts legally efficacious. I would not leave in effect a rule of constitutional law which so severely burdens the people's right to initiate measures at will.

### III.

Before the 1965 amendment of 34 O.S. 1961 § 9, approval of a proposed ballot title to a proposed measure had to await its post-circulation filing and final approval for submission to a vote.[10] The original legislative language which authorized the proponents to submit a proposed ballot title "prior to the circulation of the initiative petition" made *no* reference to the effect it would have on the 90-day circulation period

prescribed by 34 O.S.1961 § 8. The current version of § 9, adopted in 1975,[11] gives the proponents—in subdivision (D)—the very same option as that which was initially afforded them in 1965. Sections 8 and 9 must be construed together. They are *in pari materia. Nowhere is there in either § 8 or § 9 any indication of legislative intent to suspend or arrest, during the time ballot title proceedings are in progress, the fixed 90-day period prescribed in § 8 [12] for completion of circulation.* Circulation clearly does begin with, is triggered by, and continues to run from, the date of the petition's pre-circulation filing. When the post-1965 amendments are viewed in light of antecedent practice, it is at once apparent that the phrase in § 9D to the effect that "the ballot title shall be processed ... prior to the circulation of the ... petition" was intended merely to permit such process to take place *before* the *completion* of the petition's circulation. There is *no* warrant either in § 8 or § 9 for postponing the commencement of the 90-day period beyond the outcome of ballot title proceedings. The clear legislative purpose is thus amply met by construing the crucial phrase in § 9D to mean that "the ballot title ... [may] be processed prior to the [completion] of the circulation ... "[13] Any other meaning of the quoted phrase places in the hands of the proponents a self-generated device for unilaterally extending the fixed statutory period between pre-circulation and post-circulation filings and gives them the advantage of a longer campaign and publicity for capturing public attention.

I would therefore overrule our prior decision [14] that allows the commencement of § 8 circulation period to be postponed beyond completion of ballot title proceedings under § 9D.

---

9. Art. 5 § 1, Okl.Const.

10. Okla.Sess.L.1965, ch. 224, p. 388, 34 O.S. Supp.1965 § 9.

11. 34 O.S.Supp.1975 § 9.

12. Now 34 O.S.Supp.1975 § 8.

13. Whenever the intention of the legislature appears clear from a consideration of enactments *in pari materia*, language may be altered and new words supplied to give the statute that meaning which is necessary to effectuate legislative intent and harmony. *WRG Const. Co. v. Hoebel*, Okl., 600 P.2d 334, 337 [1979].

14. *In the Matter of the Proposed Ballot Title of State Question No. 541*, Okl., 601 P.2d 103 [1979]; see also, Opinion 80–116 by the Attorney General, dated June 16, 1980.

Because I cannot join the court in its commitment to precedent I deem so very harmful to the law's symmetry and to its accord with time-honored principles of judicial restraint, I concur in the judgment *only* insofar as it holds that Petition No. 315 is not vulnerable to protestants' *procedural* challenges.

## SUPPLEMENTAL OPINION ON REHEARING

LAVENDER, Justice:

In their Petition for Rehearing, Protestants first urge error in that the opinion rendered by this Court on February 5, 1982:

### I.

"By ruling that the county option vote, and not the Initiative Petition, will impose or levy a *tax*, this Honorable Court has ruled that voters in a county can impose a State *tax*, that being the one-third of the 12% to 18% *charged on wagers made*, to be paid to the State of Oklahoma as provided in § 7B of the Petition." (Emphasis supplied.)

In support, Protestants allege violation of the Oklahoma Constitution, Art. 10, §§ 7, 9, 10, 20, 26, 35.

The arguments of Protestants are based upon a misconstruction and misapplication of these Constitutional provisions, prompted by the use therein of the generic term "taxes" and assuming that as therein used, the Constitutional provisions relate to the Initiative Petition before us. Such is not the case.

The demarcation between a "license tax," "occupation tax," or "privilege tax," on the one hand, and "property tax" on the other hand, is set forth in detail in *In re Skelton L. & Z. Co.'s Gross Production Tax for 1919*,[1] in the following language:

"There is no excuse for a confusion of the two kinds of taxes, occupation taxes and property taxes. They are separate and distinct species of taxes, as distinct from each other in their kind and in their mission as tort and assault. A tax is an 'occupation tax' or a 'property tax' according to what it actually is, the same as a lens is concave or convex, or a coin is silver or gold. They are essentially different, in both their character and their mission; the sole mission or function of a property tax being to raise revenue, and when the revenue is collected its mission is fulfilled. It never imposes any conditions nor places any restrictions upon the use of property nor the exercise of a privilege. The mission of a 'license tax,' 'occupation tax,' or 'privilege tax,' or by whatever name this species of tax may be called, is always to regulate a given business, or control the right to engage in a given occupation. It is imposed as a condition or as an element of the conditions upon the right to exercise a given privilege, its primary mission being to regulate and control, and while the tax itself may not always be the sole condition, yet its payment is invariably made a part or a factor in the conditions upon which a business may be conducted by the statute under which such tax is levied. In other words, the primary object and purpose of every statute which levies an occupation tax is to regulate the conduct of the business affected.

"The kind of a tax or the species to which it belongs is not made by giving it a name, nor its species changed by changing its name, either by legislative enactment or by judicial decree. It is a property tax *or* an occupation tax *according* to the mission given it by the law under which it is levied.

"The power to levy the two taxes is derived from different sources of government—the occupation tax from the police power to regulate, while the property tax is from the power to raise revenue. The validity of the two taxes is tested and determined under different principles of law. The validity of an occupation tax is determined by the question whether a state has the power at all to levy such a tax—whether it is at all within the police

1. 81 Okl. 134, 197 P. 495 (1919).

power of a state to impose such a tax, with its attendant regulatory conditions. The validity of a property tax is not determined by whether a state has power to levy such a tax because such power is inherent, the power to raise the necessary revenue for government being inherent in the very fact of government itself, and the validity of such a tax is determined by the law governing its rate, its uniformity, its reasonableness or excessiveness, or whether it is discriminatory or confiscatory, or whether the manner of its assessment and collection is regular or irregular or constitutes 'taking without due process of law,' or amounts to 'denial of equal protection under the law.' The basis of an occupation tax lies in the police power to regulate, but the basis of a property tax is 'inherent' in the very fact of governmental protection of property. The fact that the proceeds of an occupation tax may constitute a portion or the sole source of revenue does not change its mission, nor make it any the less an occupation tax. Nor does the fact that an occupation tax is levied upon an ad valorem basis render it any the less an occupation tax. This method is quite frequently adopted, and in some cases might be the most just and reasonable measure for such a tax. Both kinds of taxes may be levied upon the same property, and both be levied upon an ad valorem basis, and both be valid. Or both may be invalid; the property tax because it is excessive or discriminatory, and the occupation tax because the state has no power to levy it. Neither does the fact alone that a given tax may be a burden upon a given business constitute a test as to what kind of a tax it is, nor does the amount or weight of such burden alone constitute a test as to its validity. A tax may be a very onerous burden, and still be perfectly valid, or it may be so very slight as to constitute no perceptible burden, and yet be wholly invalid; nor does the fact alone that the weight of such burden be indirectly upon a federal agency either change the character of a tax or constitute an exclusive test as to its validity. See *Wiggins Ferry Co. v. East St. Louis*, 107 U.S. [365], 374, 2 Sup.Ct. 257, [264], 27 L.Ed. 419; *Western Union Tel. Co. v. Atty. Gen. of Mass.*, 125 U.S. [530], 550, 551, 8 Sup.Ct. 961, [964, 965], 31 L.Ed. 790. For further illustration: In *Thomas v. Gay*, 169 U.S. 264, 18 Sup.Ct. 340, 42 L.Ed. 740, a tax of 24 mills on the dollar levied by Oklahoma Territory upon cattle grazed upon an Indian reservation under a federal lease was held to be a valid tax because it was a property tax within the proper scope of the power to raise revenue, and yet, if the territory had sought to impose a tax of one-tenth of one mill upon the mere right to graze cattle upon such reservation, the payment of such tax being made a condition upon the mere right to exercise such federal agency, such tax would at once have been declared invalid, yet the burden of such tax upon such federal instrumentality would have been only 1/240 part as heavy as the tax which the court held to be valid; the reason being that the lighter tax was one which in the very nature of our dual form of government a state has no power to levy, it being an occupation tax, while the other tax, the property tax, though 240 times as great, was held to be valid, being upon the lessees' private property having a taxable situs within the territory. The same questions were involved, and same decision rendered in *Wagoner v. Evans*, 170 U.S. 588, 18 Sup.Ct. 730, 42 L.Ed. 1154.

"Upon the same principle the 'net proceeds tax' of Nevada was held to be valid in *Forbes v. Gracey*, 94 U.S. 762, 24 L.Ed. 313.

"And the Colorado 'gross products tax' upon mining claims from the government was upheld in *Elder v. Wood*, 208 U.S. 226, 227, 28 Sup.Ct. 263, 52 L.Ed. 464.

"Upon the same principle the 'gross receipts tax' of Minnesota was upheld in *U.S. Express Co. v. Minnesota*, 223 U.S. 335, 32 Sup.Ct. 211, 56 L.Ed. 459.

"And in *Gromer v. Standard Dredging Co.*, 224 U.S. 362, 32 Sup.Ct. 499, 56 L.Ed. 801, the Porto Rican tax was held to be valid.

"Therefore the weight of a tax, or its effect in dollars and cents, is not of itself a test of its validity, nor of its kind.

"A property tax constitutes a burden upon a given business only to the extent of the amount of the tax, but an occupation tax with its ancillary conditions, if not paid, may stop the business altogether. . . ."

While Skelton was overruled in the *conclusion* therein drawn by the Court in *Apache Gas Products Corp. v. Oklahoma Tax Com'n*[2] wherein this Court held that "gross production tax" is not a property tax but an occupation or license tax upon the occupation of producing natural gas (see Syll. 2), the distinctions between the two types of "taxes" as herein quoted are as valid today as they were then.

Whether the "tax" imposed by the terms of the Initiative Petition are given the cognomen of a "license tax," "occupation tax," or "privilege tax," its operational effect clearly distinguishes it from a "property tax" contemplated by the Constitutional provisions referred to, and those provisions do not apply here.[3] Thus we have held that the statute imposing a "franchise or excise tax" against every corporation or other business organization of $1.25 for each $1,000 of capital used and declaring that the "tax" imposed for the right granted by state law to exist, is an "excise tax" and not a "property tax";[4] that a tax upon municipal swimming pool receipts is an "excise tax" and not a "property tax";[5] and that "special assessments" levied against particular property to enforce payment for benefits thereon are not "general taxes";[6] and because of the nature and operational effect of such levies, are removed from the restrictions and limitations of Constitution-al provisions such as are cited by Protestants.

In *Thurston v. Caldwell*,[7] we held that Art. 10, Sec. 20 of the Oklahoma Constitution did not preclude the state from imposing taxes for municipal purposes insofar as such acts relate to counties, cities, and townships.

In *Missouri, K. & T. R. Co. v. Meyer*,[8] the Court held that Art. 10, § 19 did not apply to the gross receipts tax imposed upon the production of coal, oil, gas, or other ores.

In *Ex Parte Marler*,[9] we upheld a law permitting cities and towns to assess an occupational or license tax on building contractors for revenue purposes.

License charges may be imposed for regulation, or for revenue, or for both. The power to thus regulate, control, or to produce revenue and to thereby control the exercise of the occupation involved rests in the sound discretion of the legislature,[10] or, as here, in the sound discretion of the people speaking through the initiative process.

## II.

■ Protestants next allege that the amendment to the ballot title promulgated by this Court makes the Initiative Petition which was circulated for signatures materially different from the ballot title that is to be presented to the voters.

Suffice it to say, the modifications made in the ballot title by the Court were merely for further clarification and did not in any way effect the substance or the form of the circulated ballot title, and therefore do not constitute grounds for declaring the Initiative Petition void.[11]

2. Okl., 509 P.2d 109 (1973).

3. 103 A.L.R. 18.

4. *Scott-Rice Company v. Oklahoma Tax Commission*, Okl., 503 P.2d 208 (1972).

5. *In Re City of Enid*, 195 Okl. 365, 158 P.2d 348 (1945), 159 A.L.R. 358.

6. *City of Idabel v. School Dist. No. Five (5), McCurtain Co.*, Okl., 434 P.2d 285 (1967).

7. 40 Okl. 206, 137 P. 683 (1914).

8. 204 F. 140, (Okl.D.C.1913).

9. 140 Okl. 194, 282 P. 353 (1929).

10. 51 Am.Jur.2d Licenses and Permits § 4.

11. *Cress v. Estes*, 43 Okl. 213, 142 P. 411 (1914); 34 O.S.1971, § 24.

**560**

## III.

Protestants' final ground asserted in the Petition for Rehearing is:

"The 8% to 12% 'fee,' as interpreted by this Honorable Court, when considered with other provisions of the Initiative Petition which allows licensees to charge for their services, is excessive; and its effect is to promote wagering, which is not a valid exercise of the State's police power."

As we heretofore said in *In Re Skelton L. & Z. Co.'s Gross Production Tax for 1919*, supra: "The validity of an occupation tax is determined by the question whether a state has the power at all to levy such a tax—whether it is at all within the *police power* of a state to impose such a tax, with its attendant regulatory conditions." (Emphasis added.)

In *Jack Lincoln Shops v. State Dry Cleaners' Board* [12] we held (Syllabus 1 by the Court):

"The Legislature is primarily the judge of whether facts and conditions exist that make it advisable that any certain business be regulated for the public good, under the police power, and as to what means are best adapted to regulate it, and every possible presumption is to be indulged in favor of the correctness of such finding, and although the courts may hold views inconsistent with the wisdom of such legislation, they may not annul it as being in violation of substantive due process unless it is clearly irrelevant to the policy the Legislature may adopt or is arbitrary, unreasonable or discriminatory."

What we said in Jack Lincoln Shops applies equally to legislation by Initiative Petition.

■ We did not in our opinion of February 5, 1982, hold, as Protestants allege, "that the police power of the state extends to the promotion of gaming or gambling." What we said was: "The legislative power extends to imposing a charge

or fee for distribution as purses as part of the regulation and promotion of pari-mutuel horse racing." In other words, it is within the police power to legislatively regulate and control pari-mutuel horse racing. The means by which it is regulated is primarily a legislative matter unless patently unreasonable, arbitrary, or discriminatory. We cannot say the regulatory means employed in the Initiative Petition are so unreasonable, arbitrary, or discriminatory as to be struck down as a matter of law.

The Petition for Rehearing filed herein by Protestants is overruled.

IRWIN, C. J., BARNES, V. C. J., and HODGES, SIMMS, DOOLIN, HARGRAVE and WILSON, JJ., concur.

OPALA, J., abstains for reasons stated in his opinion herein.

---

**12.** 192 Okl. 251, 135 P.2d 332 (1943), appeal dismissed 320 U.S. 208, 63 S.Ct. 1448, 87 L.Ed. 1847.